## EDITH P. DIAMOND *v.* OLIVER A. DIAMOND

[No. 25, April Term, 1943.]

*Decided June 2, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, GRASON, MELVIN, and ADAMS, JJ.

*Thomas J. Kenney*, with whom was *Arvum K. Rifman* on the brief, for the appellant.

*Charles C. DiPaula* and *Morton M. Robinson* submitted on brief for the appellee.

MELVIN, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court No. 2 of Baltimore City granting the appellee (plaintiff) a divorce *a vinculo matrimonii* on the ground of abandonment. The appellant (defendant) in her answer denies abandonment by her as alleged in the bill of complaint, and asserts that the separation of the parties is not deliberate and final and is not beyond reasonable expectation of reconciliation. She asserts, also, that "she has been at all times ready, willing and able to forgive her husband's misconduct (alleged infatuation for another woman), and is to this day desirous of re-establishing the family life with her husband and their two minor children, but that the said husband has steadfastly refused."

After hearing voluminous testimony, which extends the record to 191 pages, the chancellor passed a decree in which he granted the husband a divorce and at the same time awarded the custody of the two minor children to the wife, and ordered him to pay for the support of each child the sum of $7 weekly. This appeal relates solely to that part of the decree which granted the divorce.

The parties to this suit were married on June 29, 1927, after an elopement, at which time the bridegroom was nineteen years old and the bride seventeen. He continued to live with his mother for six months after the marriage and she with her parents, in Baltimore City. Having no means of support at that time, the young husband was not in a position to provide a home for his wife, and so went to live with her at the home of her parents on Aisquith Street. They continued to live there for about ten years, during which time their two children were born, one in 1929 and the other in 1932.

In 1937 they all decided to move to a larger house and selected one of the new houses then being built in the 7100 block of Harford Road. This was bought on a strictly "fifty-fifty" basis by the Diamonds (parties to this suit) as owners of a one-half interest, and by the wife's parents, Mr. and Mrs. Fowler, as the owners of the other one-half interest. All expenses were to be borne on the basis of that equal division, plus $15 a week board paid by the Diamonds to the Fowlers.

After they had been living in this new home for about a year and a half, according to the husband, and about three years, according to the wife, the husband left there and has not since returned to live with his wife and children. The only reason he gave his wife at the time was, according to the record: "I said I was going to get out of the house and said was she coming with me. She said no, she was going to stay with her mother." Later in the husband's testimony he elaborates somewhat on this point by stating that he told his wife he wanted to establish a home of their own, but that she "just wasn't going to leave her mother." He admits that no such conversation with his wife ever took place in the presence of any other person, and the wife very emphatically denies the fact of any such conversation. Her testimony is that after they bought and moved into the new house on Harford Road there was no mention of establishing another home. When asked the question on cross-examination: "Didn't he complain after that (1937) that he

wanted to live with his wife and children separate and apart?", she answered: "He did not, I wish he had." It is also significant that, so far as shown by the record, the husband did not complain to either of his parents-in-law, about the joint family domicile, and did not tell them that he wanted to live separate and apart with his own family. Mrs. Fowler, the mother-in-law, states specifically that he never did make any such complaint or statement.

Continuing, the wife's testimony shows:

"Q. Didn't you tell his sister you would never leave your mother? A. No. I was married to him.

"Q. Did you tell her that? A. No, I did not.

"Q. Didn't she tell you that was the trouble, that he wanted to live separate and apart with his family? A. Yes.

"Q. In response to that statement, didn't you tell her you would never leave your mother and father? A. On the contrary, I told her my father and mother would leave the house, and she did.

"Q. Did you tell her that you would live with your husband separate and apart from your mother and father? A. I did.

"Q. And you make that statement now that you did? A. I make that statement because I said it."

In that connection an outstanding fact in the case is that when the wife learned from the husband's sister, after the husband had left the family home, that he may have done so because of his mother-in-law, arrangements were promptly made by the wife and her mother to eliminate the ground of the husband's complaint by the withdrawal of his parents-in-law from the Harford Road home. This was actually done and the husband notified of that fact, after Mr. and Mrs. Fowler, the parents-in-law, had taken up their residence elsewhere. Notwithstanding this fact, the husband still failed and refused to re-establish a home with his wife and children and continued to live at the abode which seemed to afford him more satisfaction than the one he had

left and in which he and his wife held title to a one-half interest.  This abode which he chose was one on Brightwood Avenue, and included among its eleven occupants a woman frequently alleged in the record by the wife and some of her witnesses as the real cause of the husband's staying away from his own home.

When the wife's parents moved away from the joint home on Harford Road, and the husband was importuned to return, he shifted his ground for defending his absence from that of "mother-in-law trouble" to the ground that he was financially unable to keep up such a large house by paying the double expenses required to do so.  However, the record furnishes two answers to this:

First: When the parents moved out of the Harford Road home in 1940, they not only did not make and demand of the husband about imposing upon him any increase in burdens, but, on the contrary, expressed a disposition not to do so. In the words of the mother-in-law: "I said 'Edith, here is the house; if it is my fault I couldn't break up a home. We will go.'  I said: 'Do exactly as you please.  I don't care what you do'."  She further made the statement that there was no mortgage on the house because she (the mother-in-law) had paid it off.  Although the husband testified to the effect that his wife's parents wanted him to take over all the carrying charges of the house and pay them off in full at that time for their one-half interest, this testimony is uncorroborated, and does not furnish a sound basis for the husband's continued refusal to return to his family.

Second: The carrying charges on the house amounted to a total of $65.50 per month, and the husband's income at the time in question is shown to have been substantial.  According to his testimony, when he left his wife and children his earnings were "running around $40.00 or $42.00, sometimes $45.00 a week."  The wife's testimony is that around 1940 and 1941, the money the husband brought home from his salary and bonus was about $80

a week. Statements from the husband's employer, American Stores Company, filed as an exhibit in the case, showed his gross earnings to have been $8,089.07 in 1940; $7,745.34 in 1941 and $5,825.55 for nine months during the year 1942.

It is quite obvious from these figures that there is no merit to the husband's attempted justification of his failure to go back to his home and family on the ground that he could not financially afford to do so.

It is relevant to note here that this was a new house which, according to the undisputed testimony, was adaptable to the making of two apartments without excessive expense. The wife's testimony is that the house would not even have to be remodeled or "to do a thing" to provide another apartment rentable at about $40 a month, while the husband's contention on this point is that, to do so, certain alterations, such as running gas and water pipes to the second floor, etc., would have to be made.

Under the circumstances above recited, all that seems to have been needed for a complete reconciliation and restoration of home and family life between these parties were a real desire and intention on the part of the husband to that end. The old expression, "Where there's a will, there's a way," has direct application here, and all the obstacles could have been, and still can be, readily removed if the will to do so were present.

The record shows that the wife, on her part, from the beginning of this domestic relationship all the way through, made repeated and continuous efforts to have her husband return to her and their children. The record teems with instances of these efforts, including documentary evidence. She even went so far as to consult a clergyman who was the rector of the church of which her husband was a member and enlisted his sympathetic support and intercession for her husband's return. All these efforts were of no avail, however, for the husband showed a determination to defeat them.

Pointed illustrations of the husband's attitude are to be found in two of the several communications from him

to his wife subsequent to his leaving. In one of these, dated August 24, 1940, he says, in part: "You can see that things between you and me can't be the same as they used to be. I think it is better if we just call the hold thing off. I am not coming out to the house anymore. You can either send my clothes to 3405 E. Lombard St. or roll them up in a bundle and put them in the garage and I'll get them sometime Wednesday or Friday night. Don't write anymore letters to me address to American Stores Warhouse and don't call on the telephone if you or Janet (their daughter) must write send it over to Lombard St. * * *" Again, in May, 1941, in a note addressed to his wife, the husband said, in part: "You can do anything you want to about the house but stop writing letters to every member of my family telling them your troubles because they can't make me come back to you."

While the record in this case is unduly voluminous, the substance of the testimony is shown by the above recital of facts, which are clearly established. The plaintiff's theory of law applicable to these facts, as indicated by his counsel's brief and argument, is that the wife deserted him because of her alleged refusal, without sufficient cause, to live with him in a home provided by him. *Hoffhines v. Hoffhines,* 146 Md. 350, 357, 126 A. 112. Numerous other authorities are cited in support of this theory, as well as in support of a collateral point made by appellee that the proposed "offers of reconciliation" made by appellant were legally insufficient.

However, the decisive answer to the first point is that there is a failure of proof of the wife's refusal. This takes the case entirely out of the scope of the authorities mentioned. On the other point relied upon by appellee, it is sufficient to note that, while the principles of law cited on his behalf are correctly stated, the facts of this particular case negative their applicability here.

Both the original separation and the continuance of it appear to be without sufficient cause in law. This places the husband, and not the wife, in the position of

the erring spouse and the one upon whom rests the obligation of making an offer of reconciliation. Such an offer, however, must be in good faith, free from improper qualifications and conditions and really intended to be carried out in accordance with the letter and the spirit of the matrimonial vows and obligations. *Kirkwood v. Kirkwood,* 165 Md. 547, 551, 170 A. 180, 182; *McClees v. McClees,* 162 Md. 70, 158 A. 349; *Simmont v. Simmont,* 160 Md. 422, 153 A. 665; *Dearholt v. Dearholt,* 178 Md. 405, 13 A. 2d 538; *Pitts v. Pitts,* 181 Md. 182, 29 A. 2d 304.

In the instant case, the record does not show that the husband, from the time he left his wife and children, has ever put himself in the position of setting up a home for them or that he really intended to make the restoration of their family home life a paramount consideration. He can have no standing now as a suitor for divorce without these two prerequisites. Moreover, the allegation in his bill of complaint that the separation is beyond any reasonable hope or expectation of reconciliation is not only not proved in the case, but on the contrary, is disproved by the testimony from both sides—at least, so far as the wife is concerned, as heretofore pointed out.

There is every indication that the appellee, himself, has a natural love and effection for his children and that he is a young man of good qualities. He and the appellant spent over ten years of their married life without a break in their relations, reared their children with loving care, and were laying the foundation for a family unit that would mean not only the normal and natural way of living for them, but would be, in a broad sense, a real contribution to society and the State.

It is not the policy of the courts to permit the disruption of any such relationship except for grave and weighty causes, which are clearly lacking in the case now before us. *Kline v. Kline,* 179 Md. 10, 15, 16 A. 2d 924; *Buckner v. Buckner,* 118 Md. 101, 84 A. 156, 160.

On the contrary, courts, generally, favor reconciliation based upon the reasonable hope of permanency (*Kline*

*v. Kline,* 169 Md. 708, 182 A. 329, 333), and in pursuance of this policy the parties to the instant case will be left free to renew their efforts toward readjustment of their domestic relations and the establishment of a family home if both of them have the will to do so. The record indicates that there is still ground for reasonable expectation and hope of such a consummation. *Twigg v. Twigg,* 107 Md. 676, 681, 69 A. 517.

The facts and the law of this case point unmistakably to the court's duty to deny the divorce as prayed by the appellee and to dismiss his bill of complaint.

*Decree reversed, with costs, and bill of complaint dismissed.*