## FLOHR *v.* FLOHR

[No. 184, October Term, 1949.]

*Decided June 7, 1950.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Robert E. Clapp, Jr.,* for appellant.

*Charles McC. Mathias* and *Charles McC. Mathias, Jr.,* for appellee.

MARBURY, C. J., delivered the opinion of the Court.

The chronology of this case is as follows. The parties were married on July 18, 1943, he being then twenty

years old and she nineteen. They had two children, one of whom died at birth, and the other, a boy, is now in the custody of the appellee. They lived together, with the exception of some periods of separation, until January 10, 1949, when the wife left the home. The wife had threatened to leave before, the first time in September, 1947. In May, 1948, she stayed away for 29 days and then returned. Some time that Fall they had another disagreement, the husband left for a day or two, and, while he was away, the wife left. That time she brought suit in Washington County for abandonment, but that was finally dropped and the parties went on a trip together. Then came the last separation in January, 1949.

It is neither necessary nor advisable to overload this opinion with the details of the voluminous testimony on either side. It is sufficient to say that the couple first went to live in an apartment in his parents' home at Blue Ridge Summit. Her parents lived across the state line in Pennsylvania. From the early years of the marriage the husband apparently spent many nights away from home, and had at least one girl to whom he was paying some attention. From his testimony and his general attitude he does not seem to have taken a serious view of his marital obligations, and at least twice, seems to have attempted to be unfaithful to his wife, although the evidence does not show that he was. This general attitude on the part of the husband did not help matters at home, and the parties discussed divorce many times. Finally, in order to get away from too much parental interference, perhaps on both sides, the husband got an apartment in Sabillasville, where they went to live. The husband suggested to his wife that they get a divorce and divide the custody of the little son, but the wife insisted that under no circumstances would she give up the child, although she did not object to his seeing him. This was not satisfactory to him, and so they went on living together until the last separation.

The husband sued for divorce *a mensa* on the ground of abandonment. The wife filed a cross-bill for a similar divorce on the ground of abandonment. Much testimony was taken, and after a consideration of this testimony which had been taken before an Examiner, the Chancellor dismissed both the bill and cross-bill. From that decree the husband appealed, but the appellee did not appeal. We have, therefore, before us only the question of whether the husband is entitled to a divorce on the record.

On Sunday, January 9th, according to the husband's testimony, the parties went riding, taking along two young girls, one 12 and one 14, and a boy of 5, all of whom lived in the same apartment house. They went by the home of the husband's parents, stopped for a few minutes, then stopped at the cemetery where their first child was buried, got some ice cream cones somewhere, had a little Sunday drive around the mountains, and came home. The wife took the baby upstairs. The two girls walked up the road to take some pictures, and the little son of the landlord asked the husband to take him along with them. They went up the road, and stayed about fifteen minutes. When they came back the husband found that the wife had telephoned her mother to come up and get the baby. The mother and father's car came up. There was some argument, and the husband said that if the baby went the wife would have to go too. He finally took the baby, and went in the landlord's kitchen. The wife then made quite a scene to get her baby, finally a policeman was called by the landlord, and the husband took the baby upstairs in his own apartment. Everything then calmed down, and the husband invited the wife to go out to supper, but she declined. He started to go, but then stayed downstairs in the landlord's apartment to see what was going to happen. After a short while the wife's parents and her brother-in-law came up in their cars, and the wife came downstairs with the baby. The husband then made his presence known, and found all the suitcases packed and ready

to go. He would not let her go, and the argument continued until about midnight. The next morning, when the husband started to go to work, the wife said, "Better kiss Johnnie goodbye. He won't be here when you get back." The husband had to go to Baltimore that day with his father on some business, and in the afternoon he found his wife moved out and gone. She had written on the back of the wedding picture, "Will be back. Just visiting." About a week later the husband went over to the wife's parents' home in Pennsylvania to try to see the baby. He could not get in the house, consulted a lawyer, and under the latter's advice he got a constable and went back to the house, but again could not gain admittance. When he went to get the constable to make a second effort, he was told by the latter that he had been informed by the brother-in-law that there was no use for him to try, -he would not be allowed in the house. He again consulted the lawyer, and swore out a writ of habeas corpus for the child. At a hearing in Pennsylvania, the court gave the custody of the child to the wife with permission to the husband to see it, but not to take it into Maryland. This order was passed on January 28, 1949, and the husband's suit was filed in Frederick County on May 18, 1949. .

The contention of the husband is that whatever may have been his marital shortcomings, they were all forgiven by his wife, when she lived with him as his wife up until at least the day or two days before she left, that nothing occurred on January 9th or 10th which justified her leaving, and, therefore, he is entitled to a divorce on the ground of abandonment.

If the wife had a cause for divorce (which we do not determine), but had resumed cohabitation with her husband, and then had left without any further misconduct on his part, it might readily be held that she had condoned the previous misconduct, if any. That question is not before us, because there is no appeal from the dismissal of the wife's bill of complaint. We are

concerned on this appeal solely with the question whether the departure of the wife was an actual abandonment.

We have said many times that to constitute abandonment there must actually be not only a separation, but an intention that such separation shall be permanent. *Dunnigan v. Dunnigan,* 182 Md. 47, 31 A. 2d 634, and cases cited. The two elements need not begin at the same time, but desertion begins when one is added to the other. *Taylor v. Taylor,* 112 Md. 666, 77 A. 133. The length of time in which a separation has existed "is an element of consideration in determining whether an alleged abandonment is real, or merely exists in imagination or desire of the complainant." *Boyd v. Boyd,* 177 Md. 687, (unreported), 11 A. 2d 461, 464. In the case before us the wife testified that she thought her husband was going skating on Sunday afternoon, that she would be left alone as she had frequently been, and she, therefore, called her parents to take her and the boy home with them. They only lived a few miles away, although in the other state. When she was prevented from doing this, but finally succeeded the following day, she said it was her intention to return after she had thought things out and decided what to do, and the note she left indicated that intention. Her husband made no attempt to communicate with her for eight days, and then started habeas corpus proceedings in Chambersburg, to get the child. This effectually stopped any immediate possibility of reconciliation, but whether that situation is permanent does not satisfactorily appear from the record. The wife, in her testimony, stated that she would be willing to make another try if there could be some agreement about where they were to live. She said she left once before because at that time there was continual interference from the husband's parents, and as a result of that leaving, they got the apartment in Sabillasville, which the wife claims was not suitable. The husband rather indicated that he did not want his wife back, but he said he had no hard feelings against her. Under these circumstances we are unable to find

that there has been a permanent abandonment of the husband by the wife, such as would justify a divorce *a mensa*. That was the conclusion reached by the Chancellor on the record before him.

It is not the province of the courts to settle marital disputes or to determine what husbands and wives should do in order to live harmoniously together. These are intensely personal matters which the parties must determine for themselves. What the courts have to do is determine the effect of actions that the parties have already taken and to adjudicate their legal rights based on these actions. In so doing, it is not the judicial province to encourage separations or to labor to find grounds for divorce where such grounds do not clearly appear. On the contrary, it has always been recognized that legal separations should not be decreed for light and trivial causes. We think the Chancellor applied these principles in his decision, and his decree will be affirmed.

*Decree affirmed with costs.*