## MORAN *v.* MORAN

[No. 171, September Term, 1958.]

*Decided March 19, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ., and DIGGES, Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Bernard H. Herzfeld,* for appellant.

*Wallace Dann,* with whom were *Howard Calvert Bregel* and *Calvert Ross Bregel* on the brief, for appellee.

DIGGES, J., by special assignment, delivered the opinion of the Court.

The wife has appealed from a decree of the Circuit Court No. 2 of Baltimore City dismissing her complaint filed against her husband whereby she seeks permanent alimony based on allegations that the husband is guilty of adultery and desertion.

Alimony may be granted in this State upon a showing of facts sufficient to support a decree of divorce either *a vinculo* (Art. 16, Sec. 24, 1957 Code) or *a mensa* (Art. 16, Sec. 25, 1957 Code). Article 16, Sec. 2, 1957 Code; *Hull v. Hull,* 201 Md. 225, 232; *Stirn v. Stirn,* 183 Md. 59, 64.

The Chancellor found from the evidence that even though the husband "had lost love for his wife and was interested in some other woman, * * * at the time of the alleged desertion, and in spite of the conduct of the husband, it was mutually agreed * * * that they live separate and apart." He thereupon dismissed the complaint. We are not unmindful of Maryland Rule 886(a), providing that a decree of the Chancellor will not be disturbed on appeal by this Court unless clearly erroneous. However, on the record before us we think the evidence clearly shows that the husband abandoned and deserted his wife without just cause.

A review of the testimony in this case discloses relatively little dispute between the parties as to the events leading up to and following their separation. We agree with the observation of Judge Cullen made at the trial, when he commented, "The testimony in this case isn't too far at variance if you eliminate all the surplus, * * *."

The testimony discloses that Leona Moran, appellant, and her husband, William J. Moran, appellee, were married in 1912; that they are now in their sixties; they have two children both adults of middle age; and they had a reasonably harmonious marital life until 1946. Mrs. Moran testified that in 1946 her husband began staying away in the evenings, caused a lot of trouble at home and told her on several occasions that she "should go out and make [her] own friends * * * because he had dates and he didn't want to be bothered with [her]." She states her husband began seeing a Mrs. Carver in 1946 but she tolerated this as best she could until March 31, 1948, when she told him she "couldn't live that way any more; something had to be done. He would have to choose between [her] and Mrs. Carver. He said 'All right then, I have chosen her.'" On that date he packed his clothes and went to live at his office, where he stayed until

his wife left for a trip to California. This trip resulted, Mrs. Moran says, from her doctor's orders because of her failing health. She remained in California about one month before returning. In the meantime, Mr. Moran had moved back home. However, instead of returning to the first floor where the parties had for sometime lived, he moved to the second floor apartment which had formerly been converted to a separate living unit for their son and to which, prior to the separation, he had been constructing a separate outside entrance so that it could be rented. From 1948 until 1954, when both of the parties agreed to sell the house to Mrs. Moran's sister, the appellee lived in the second floor apartment and the appellant lived in the first floor apartment. After the sale Mr. Moran moved from the house, and Mrs. Moran continued to live there with her mother and sister. Mrs. Moran says that on one or two occasions between 1948 and 1954 she met her husband at the doorway and asked him to reconsider and return to live with her but that each time he refused.

The testimony of Mrs. Moran is corroborated by that of the daughter. She testified that the attitude of her father towards her mother changed in 1946 when he began staying away from home as much as possible. She relates the efforts of both her mother and herself to get her father to resume marital life with Mrs. Moran after the separation in 1948. She further states that just prior to March 31, 1948, at her father's request, she went with him to Westminster, where her brother was living, for a conference between the children and the father relative to the marital difficulties of the parents. On that occasion her father informed her he was going to leave her mother and she quotes Mr. Moran as saying: "mother upset him. He couldn't live with her any more; that Mrs. Carver could do him a lot of good, she knew the right people. He was happier with Mrs. Carver and the only solution he could see was to leave my mother." She says she pleaded with him not to take this step and to "think of Mother, think of Earl [brother] and myself," but he refused.

Mr. Moran does not refute much of the testimony of his wife and their daughter, including the fact that the arguments with his wife were over his association with Mrs. Carver.

He accuses his wife of having a very jealous nature without reason, but states "I never was a Casanova. I never had as many women as I was accused of having." He admits he became acquainted with Mrs. Carver in 1946; saw her once or twice a week during that year, "more frequently" during 1947 and "rather frequently" from that time on. He agrees that the Westminster conference between the father and children took place and does not deny that his daughter accurately quoted statements made by him as to his association with Mrs. Carver and his expression of an intention to leave his wife. He further agrees that he went to live at his office on March 31, 1948, but says his wife ordered him to leave even though he concedes she may have merely asked that he make a choice between Mrs. Carver and herself. When asked if he made such a choice he answered, "If you mean I didn't go back to live with her after running out the third time, I don't intend to go back." Mr. Moran says he is happier with Mrs. Carver because of his wife's "bickering." When interrogated about his refusal of a reconciliation as testified to by Mrs. Moran, he was asked "you refused to reconcile with her, didn't you, according to your testimony?" He answered, "you are perfectly right."

Abandonment or desertion as constituting grounds for divorce means "the unjustified separation of one spouse from the other with the deliberate intention of the offender to terminate the matrimonial relation." *Bennett v. Bennett,* 197 Md. 408, 412. See also *Flohr v. Flohr,* 195 Md. 482, 487; *Dunnigan v. Dunnigan,* 182 Md. 47, 50; *Heinmuller v. Heinmuller,* 133 Md. 491, 494, and authorities cited therein.

We believe that the facts in this case demonstrate that Mr. Moran abandoned his wife in March of 1948. He attempts to justify his leaving by accusing his wife of nagging and jealousy but we have heretofore held that "nagging" (*Bradshaw v. Bradshaw,* 189 Md. 322, 325) and "jealousy" (*Schilbach v. Schilbach,* 138 Md. 56) do not justify one spouse in leaving the other.

If attentions to another woman, short of proof of adultery, may justify a wife in leaving or not returning to her husband (*Thomas v. Thomas,* 197 Md. 15, 21), certainly Mrs. Moran

had a right to demand that her husband make a choice between Mrs. Carver and herself, without being subjected successfully to a charge by him that the separation was due to her desertion (constructive) or resulted from a voluntary agreement when he "chose" Mrs. Carver and moved from the marital home. Mere acquiescence in a separation that the wife could not prevent or resignation to its continuance after it began, does not make the separation voluntary on her part. *Miller v. Miller,* 178 Md. 12, 20; *Courtney v. Courtney,* 213 Md. 600, 602.

The admitted facts in this case are remarkably similar to those before this Court in *Schilbach v. Schilbach, supra,* where the wife sought alimony, alleging abandonment by the husband. The husband answered that he left the home because his wife ordered him out; that she had a violent temper which made his life miserable; and that his wife's charge of misconduct with another woman was an outgrowth of a jealous disposition. The Chancellor found the husband guilty of desertion and decreed permanent alimony. Judge Adkins, speaking for this Court in affirming this ruling, said: "It is proper to say that we find no proof in the record sustaining the charge of criminal relations between the appellant and Mrs. Cooper; but there is evidence of association of a character calculated to excite the suspicions of the wife, and this appears to have been the cause, * * * for the marital troubles, arising late in the life of these people, * * *. The wife testified that she still loved her husband and was willing to resume the marital relations with him provided he discontinued the objectionable association. He, on the other hand, * * * said: 'Never.' "

Even if we agreed with the Chancellor's conclusion that the separation of the parties began as a result of a voluntary agreement, the evidence clearly shows it did not continue to be voluntary. Mrs. Moran, as heretofore related, before the elapse of the time necessary to permit a divorce on that ground, made bona fide offers to her husband to renew their marital relations. Appellee's admitted refusal constitutes desertion on his part and destroys the voluntary nature of the separation. *Hornstein v. Hornstein,* 195 Md. 627, 637;

*Dearholt v. Dearholt,* 178 Md. 405, 409. Obviously, such an offer of reconciliation made before the expiration of the three years, negatives the existence of the statutory requirement providing that the separation be voluntary on the part of both the husband and wife for the entire three-year period. (Art. 16, Sec. 24, 1957 Code.)

Having concluded that the husband in this case deserted his wife, it follows that the Chancellor was in error in dismissing her complaint. The cause will be remanded for the purpose of awarding the appellant such alimony as may be determined by the Chancellor to be proper. Since there has been no cross-appeal from that portion of the decree providing for payment of counsel fees and costs in the lower court by the appellee, that portion of the decree will be affirmed.

> *Decree reversed in part and affirmed in part and case remanded for further proceedings. Costs to be paid by appellee.*