# WOOD v. WOOD

[No. 69, September Term, 1961.]

(Two Appeals In One Record)

*Decided December 14, 1961.*

The cause was argued before BRUNE, C. J., and PRESCOTT, HORNEY, MARBURY and O. BOWIE DUCKETT, Judge of the Fifth Judicial Circuit, Specially Assigned, JJ.

*Donald S. Caruthers,* with whom was *Joseph D. Buscher* on the brief, for appellant.

*Marion E. West,* with whom were *West & Venables* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is a divorce case in which the wife appeals from a decree granting the husband an absolute divorce on the ground of abandonment. To a large extent the case grew out of the wife's consuming religious zeal, which led her to spend much time at church services, not only on Sundays but also throughout the week—both late afternoons and evenings—to the neglect of her home and husband, and also, as she frequently took her teen-age son along, to the interruption of his normal life, particularly his home studies. After this had been going on for about a year, the husband told her she would have to choose between her home and her great religious activity.

Matters came more or less to a head in the middle of January, 1959. For some months prior to that time marital rela-

tions had been suspended [1] by the wife. On or about January 12, the husband, in effect, called upon the wife to make the choice above stated, but he had no objection to her religious activity if limited to more or less usual proportions. The husband testified that after a few minutes' thought, his wife replied, "Well, I'm leaving, I'm going to work for the Lord." At about this same time there was some discussion of the wife leaving for a few days to help a sick friend. The husband at first agreed to her doing so, but withdrew his consent before her departure. She says that in the interim she had made a commitment in reliance on his assent. Be that as it may, the wife's absence extended not over a few days but over a period of months; and we think the evidence warranted the conclusion that the wife deliberately chose when she left to abandon her husband and her home rather than curtail her virtually all-consuming religious activity.

She returned several months later, in April, to get some clothes and a small machine and spent about forty-five minutes talking with the son, but she did not see or speak to her husband. She then departed again.

Early in September, 1959, she returned a second time. On this occasion she first telephoned the son, who suggested that she come over some afternoon when he would be there in the afternoon. He did not want her to come when his father would be there because he anticipated an argument. The wife came at about 9:30 that evening without prior notice to the husband, let herself in with her key and, without more ado, went to her room downstairs and took off her dress and hung it in the closet. The husband and son, hearing the noise of the opening or closing of the door after they had gone to bed upstairs, came down and found the wife standing backed against the wall in her room. The husband's greeting was far from

---

1. Testimony on this subject was admitted without objection, but the Chancellor did not take it into consideration in reaching his conclusion because it was not mentioned in the bill. In this, we think, he may have been unduly restrictive (*Smith v. Smith,* 216 Md. 141, 145-46, 140 A. 2d 58; cf. *Abare v. Abare,* 221 Md. 445, 453-54, 157 A. 2d 427), but if so, it resulted in no prejudice to the appellant.

a welcome, but the wife refused even to speak to him at all. The husband soon thereafter called in the police who talked for a time but were not in a position to do anything and soon left. The next day the husband went to the police station and swore out a warrant for the arrest of the wife on charges of disorderly conduct allegedly committed in January. It seems evident that the charge made in the affidavit executed to obtain the warrant was quite unsupportable. The obvious purpose of the husband in these proceedings was to bring about a mental examination of the wife, and as a result of her examination by two doctors she was committed to the Spring Grove State Hospital, a mental institution. She was, however, never adjudicated insane and was discharged some eleven months later after having been allowed to go off for a number of week-ends spent with friends. The husband was evidently no enthusiast for having his wife return to the home, and she was unwilling to give up the religious attachments and activities which had led to the breach in January, 1959.

The Chancellor delivered his ruling from the bench at the conclusion of the hearing. In it he reviewed carefully and in detail all of the testimony which we have only summarized to some extent, and he dealt fully with the wife's alleged efforts at reconciliation. The case is almost wholly one of fact and of the application to the facts of established rules of law.

In the light of our review of all of the testimony (which is perhaps unusually repetitious), we could not say that the Chancellor was clearly in error—if in error at all—in concluding that the wife deserted the husband on January 15, 1959, that the desertion continued for more than eighteen months prior to the filing of the bill, that the wife, the deserting party, made no genuine effort towards reconciliation, and that there was no reasonable hope of reconciliation.

There seems to be no doubt that "the wife took the decisive step of leaving the home" in January, 1959. (See *Besche v. Besche,* 209 Md. 442, 449, 121 A. 2d 708.) It is not a case where the husband left and claimed constructive desertion by the wife. Further, we think that there is no substantial question that the wife left of her own free will and not as a re-

sult of being forced to do so by her husband's conduct. She evidently preferred as her chief occupation carrying on her very zealous religious life rather than living simply as the wife of a hard working farmer, with religion as a part of her life but not as a virtually all-consuming part of it. Not only could the Chancellor properly find the actual separation, but he could also properly find, we think, an intention on the part of the wife to terminate the marriage relation in order that she might devote herself to what she considered the work of the Lord. These facts were sufficient to establish desertion. See *Gill v. Gill,* 93 Md. 652, 49 A. 557; *Fleegle v. Fleegle,* 136 Md. 630, 110 A. 889; *Dunnigan v. Dunnigan,* 182 Md. 47, 51, 31 A. 2d 634; *Miller v. Miller,* 185 Md. 79, 82, 42 A. 2d 915; *Flohr v. Flohr,* 195 Md. 482, 487, 73 A. 2d 874; *Zulauf v. Zulauf,* 218 Md. 99, 105, 145 A. 2d 414, and cases there cited.

In accordance with what we have just said, we think that the Chancellor was not in error—certainly not clearly in error—in finding that the separation in January, 1959, was not with the husband's consent. Though the cause of friction in the home in this case was doubtless much less acute than that in *Moran v. Moran,* 219 Md. 399, 149 A. 2d 399, we cannot say that the husband was unjustified in calling upon his wife to choose between her more than intensive religious life and her marital life. That he called upon her to do so does not mean that he assented to either choice she might make. She rejected the call to domestic duty and chose what she doubtless considered a higher duty. That was her deliberate choice and her husband could not prevent it. See *Moran v. Moran, supra; Miller v. Miller, supra,* 185 Md. at 85; *Miller v. Miller* (a wholly separate case), 178 Md. 12, 21, 11 A. 2d 630; all holding that acquiescence to or assent to what one cannot prevent does not amount to a voluntary agreement thereto.

The wife's visit to the house in April, 1959, to pick up a few things involved no effort towards reconciliation. Her return in September seems a strange interlude. Though the husband's actions in response to her physical return might, under some circumstances, constitute agreement to continued separation, or actual desertion on his part (see *Hite v. Hite,*

210 Md. 576, 582, 124 A. 2d 581), we cannot say that the Chancellor was in error in concluding that the husband's conduct did not amount to such acquiescence or to desertion on his part. The wife seems to have had something of a religious obsession and her conduct on her return manifested neither affection nor a desire for reconciliation. The husband was undoubtedly concerned (and very possibly selfishly so) about her mental condition and he took the first available action (though by a method which we cannot approve) to have her sent to a mental institution for examination and treatment. Cf. *Stecher v. Stecher,* 226 Md. 155, 157, 172 A. 2d 515. Even though the husband's conduct may have been far from admirable, we think that the Chancellor was warranted in finding that the wife did not, at the time of her physical return in September make any real effort to effect a reconciliation (see *Thurlow v. Thurlow,* 212 Md. 222, 129 A. 2d 170) and resumption of marital relations. Since she was the deserting party, it was her obligation to make such an effort. *Diamond v. Diamond,* 182 Md. 103, 32 A. 2d 376; *Miller v. Miller, supra,* 185 Md. at 84; *Hooper v. Hooper,* 224 Md. 65, 69, 166 A. 2d 734. We think that the Chancellor was also warranted in concluding that neither a gesture towards reconciliation said to have been made by the wife when the husband visited her at Spring Grove, nor a conversation when, after leaving the hospital, she went with some friends to the farm where he was working amounted to a genuine effort at reconciliation, and the last conversation appears to have taken place after the expiration of the statutory eighteen months' period of desertion.

We may note that the appellant wife makes no suggestion that she was in such mental condition at any time as to have been incapable of forming or maintaining an intent to desert. Cf. *Kruse v. Kruse,* 179 Md. 657, 22 A. 2d 475, and *Stecher v. Stecher, supra.*

We finding nothing to indicate that the Chancellor was in error in finding that there was no reasonable hope of reconciliation. On the contrary, the evidence would seem to indicate that if the wife returned to the home the same situation which gave rise to the breach would develop again.

It has been stated repeatedly and it is now established as one of our Rules that in a case where the Chancellor has seen and heard the witnesses, his judgment on the facts is not to be reversed by this Court unless it is clearly erroneous. Maryland Rule 886 a; *Provenza v. Provenza,* 226 Md. 63, 66, 172 A. 2d 503, *Stecher v. Stecher, supra.* This case, we think, falls within the settled rule.

Since the wife is not entitled to a divorce, she is not entitled to alimony. However, we find no error in the order requiring the husband to pay the costs of this appeal and his wife's counsel fees in a reasonable amount. *Fries v. Fries,* 166 Md. 604, 171 A. 703; *Daiger v. Daiger,* 154 Md. 501, 140 A. 717.

The wife does not, on this appeal, contest the award of custody of the son to the husband.

The decree of divorce does not undertake to dispose of the property rights of the parties and they are not before us.

*Decree and order affirmed, costs to be paid by the appellee.*

DUCKETT, J., specially assigned, filed the following dissenting opinion.

I regret that I cannot agree completely with the opinion written by Chief Judge Brune in this unusual divorce case.

It seems clear from the testimony that the original desertion by the wife on January 15, 1959 was voluntary and deliberate on her part. However, I conclude from the testimony that the eighteen months' separation period was interrupted when the wife returned on September 8 or approximately eight months after the original separation.

In the first place, it must be recognized that the wife had the absolute right to return to the home. This property belonged to her as much as it did to the husband, so she was therefore entirely within her legal rights in returning.

Secondly, in order to obtain an absolute divorce on the grounds of abandonment or desertion for eighteen months, the plaintiff, in addition to proving that the defendant deliberately left him, must prove that the abandonment has con-

tinued uninterruptedly for at least eighteen months and is deliberate and final and the separation of the parties beyond any reasonable expectation of reconciliation. *Thurlow v. Thurlow,* 212 Md. 222; *Miller v. Miller,* 153 Md. 213. Stated another way, in order to constitute desertion as a ground for an absolute divorce, separation and an intent to desert must co-exist during the entire eighteen months' period. *Hubbard v. Hubbard,* 127 Md. 617.

Third, as Judge Henderson, speaking for the Court recently said in *Stecher v. Stecher,* 226 Md. 155, at 159:

> "* * * Marriage imposes a duty to bear and forbear and to cherish in sickness and in health. It is not to be terminated for light causes or merely because of a desire to escape from an unpleasant and unhappy environment."

Fourth, the husband's improper actions were such as not to encourage the Chancellor to grant him relief, especially as the State has a vital interest in maintaining the marriage status which may not be dissolved except for grave and weighty causes.

Finally, our law encourages estranged spouses to reconcile their differences and to resume marriage relations. Therefore, during the eighteen months' period the duty rests upon each spouse to accept any offer made in good faith by the other to resume suspended cohabitation, if it appears that such offer may be accepted without any reasonable sacrifice of self respect, health, safety or comfort. *Hite v. Hite,* 210 Md. 576.

The testimony in this case is uncontradicted that the husband made no attempt to encourage his wife to return after she left in January. The testimony is also uncontradicted that the wife actually returned on September 8th. Under the circumstances, can her actions at that time be considered an attempt to resume the marital relation? The fact that the wife had little or nothing to say to her husband upon returning can be logically explained on either of the following grounds:

(1) She was mentally deranged at the time or (2) her husband's brutal and inhuman actions left little for her to say,

and prevented a reconciliation. Upon finding that his wife had returned, he pushed her, took her pocketbook and keys and shortly thereafter called in two policemen in an attempt to have her removed from the premises. The next day, although the wife had caused no trouble and had offered to prepare his lunch, he illegally swore out a warrant for her arrest. That evening the wife was removed forcibly from her home by the police and immediately thereafter committed to Spring Grove State Hospital by two physicians obtained by the husband.

The legal effect of this commitment under Code 1957, Art. 59, § 31 presumably made by two qualified physicians after separate examinations is that the wife was insane and that the disease required her to be placed in a hospital where the insane are detained for care and treatment. The wife remained in this Institution from September 10, 1959 to July, 1960, although she was permitted to leave during week-ends after the first two or three months.

Even though the desertion of the husband by the wife was originally wilful, the period which she was confined involuntarily in an insane asylum must be excluded in determining whether the desertion continued for the requisite period. In other words, by the great weight of authority, the continuity of the desertion is legally interrupted.

> Annotation, 19 A.L.R. 2d, 144, 167; 4 A.L.R. 1333;
> *Dorsey v. Dorsey,* 90 App. D. C. 284, 195 F. 2d 567;
> *Cox v. Cox,* 268 Ala. 572, 109 So. 2d 703;
> *Hartwell v. Hartwell,* 234 Mass. 250, 125 N. E. 208;
> Schouler, *Marriage and Divorce,* 6th Ed., p. 1837, § 1621;
> Nelson, *Divorce and Annulment,* 2nd Ed., § 4.11, p. 82;
> *Pipitone v. Pipitone,* 97 N. J. Eq. 35, 127 A. 164;
> *Wright v. Wright,* 125 Va. 526, 99 S. E. 515;
> See also: *Bowersock v. Bowersock,* 210 Md. 427, p. 438;
> *Noellert v. Noellert,* 169 Md. 559, p. 562;
> *Kruse v. Kruse,* 179 Md. 657, p. 663;
> 17 Am. Jur. § 97, p. 318, § 183, p. 380.

If for some reason, not apparent from the transcript, the Chancellor discounted the effect of the physician's commitment, it is nevertheless clear that the husband's suit must fail.

Under such circumstances, the husband's actions were improper in having his wife arrested, evicted and committed. He, as well as the wife, had a duty to effect a reconciliation if reasonably possible. We find from the testimony, however, (1) that the husband admits that he stopped loving his wife the day she left in January, 1959; (2) that although he knew his wife was ill in the hospital, he refused to visit her for two or three weeks, although she phoned as soon as she could obtain permission and pleaded with him to come; (3) that when the wife told him at the hospital that she loved him, he replied, "Anne, I'm through—I've got nothing else to do with you"; (4) that he refused to assist in having her released from the Hospital; (5) that he gave her little or no money during her illness and after her release; (6) after the wife left the Institution, the husband stated that he would not have her back under any circumstances and, at the trial, testified that he would not agree to a reconciliation.

The wife's actions, although erratic, were always upright and sincere. Her testimony, although rambling and confusing, was honest and unimpeached.

The husband's actions were not sincere and were, in some instances, reprehensible. In addition to what has been previously stated, he changed the locks on the house; moved four members of his family into the home, thereby preventing his wife from returning; failed to pay the meager board required at the Institution, while at the same time, purchasing an expensive automobile and failing to pay his income tax.

I must conclude, therefore, that the bill of complaint should be dismissed and husband ordered to pay permanent alimony to the wife.