## FELTGEN *v.* FELTGEN

[No. 9, September Term, 1964.]

*Decided December 7, 1964.*

The cause was argued before HENDERSON, C. J., and HAMMOND, PRESCOTT, MARBURY and OPPENHEIMER, JJ.

*Jo V. Morgan, Jr.,* for the appellant.

*Henry A. Babcock,* with whom were *Green, Babcock & Dukes* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

The Chancellor denied appellant's prayer for an absolute divorce on the ground of voluntary separation of the parties for the statutory period, and she has appealed.

She names five questions as being presented in the appeal: the first three claim that errors were committed by the Chancellor in not holding (and refusing to permit her to adduce all of her available evidence to show) that the original separation of the parties was voluntary; the last two contend that the evidence produced requires a decree for an absolute divorce on the ground of voluntary separation. We find it necessary to determine the last two only, as will be shown below.

The parties were married in 1937, and two daughters (both now adults and college graduates) were born as a result thereof. Both of the parties are about 59 years of age, and are natives of Luxemburg. The husband came to this country as a young man and obtained employment as an expert machinist at the

United States Navy Yard in Washington, D. C. In 1937, he sent to Luxemburg for the appellant, who is the sister of the wife of his twin brother.

Prior to the marriage, appellee had purchased a dwelling on Fairfax Road, Bethesda, Maryland, and title to this property was transferred to both names shortly after the marriage, and is still so held.

The marriage seems to have been a happy one until at least 1948, when they decided to purchase another dwelling on Sleaford Road, also in Bethesda, which was a more convenient and safer location from which the daughters might attend school. The purchase of this property caused the first apparent dissension between the parties. The purchase required $7,500 in cash, and the wife, according to the husband, demanded that title be placed in her name, alone. He objected, but all of his savings were deposited in her sole name (she was never gainfully employed); so she prevailed. Soon after the parties moved into this new home, the husband occupied a space in the basement, so that most of the rooms upstairs might be rented (as well as the house on Fairfax Road). The wife and daughters also lived in the basement in the summers, but retained one room upstairs for the three in the winters.

It seems appropriate to say here, somewhat by way of interpolation, that the exact and precise meaning of the parties, both in their testimony and letters, is difficult to ascertain, due, apparently, to their lack of complete familiarity with the use of the English language.

The parties ceased to have sexual relations together at least as early as 1956. He contends that she refused to continue relations with him; she claims that the cessation thereof was because "he was so vicious always and cruel to me [although few specific incidents of purported cruelty or viciousness were named]."

From the date of their marriage until their separation in 1960, the husband worked at his regular occupation and also worked Saturdays, Sundays and night-times at odd jobs—from 1951 to 1956, he earned some $20,400 from the odd jobs. For some time after 1948, the wife rented the Fairfax Road house

and the rooms in their residence for about $200 per month. From the date of their marriage until the separation, some 23 years, the husband delivered his entire salary from the Navy Yard and all of his income from the odd jobs to the wife (with minuscular exceptions), who, in addition, received all of the rents.

The husband was allowed very little money for himself. If he needed gasoline for his automobile, the wife would give him a "couple of dollars," or give it to one of the daughters to go with him to the filling station in order to be certain the money was spent for gasoline. He testified that he did not obtain a new suit of clothes during the entire first 23 years of married life, although his wife did purchase his work clothes. After 1957, he was not permitted above the basement in the house (without good cause being shown), for fear that he would damage the rugs, furniture or painting. He was not permitted to watch television by himself, except very late at night when the others had retired. And at least one of the daughters had become very disrespectful to him. A reading of the record supports the finding of the Chancellor that the wife's insistence upon handling all of the family finances is one of the main reasons, if not the main one, for the separation of the parties.

The husband stated that there were three occasions, beginning in 1957, when he did not pay over his entire salary to his wife. On the first, he took out five dollars for his own necessaries and turned the balance over to her. On this occasion, the turning of the balance over to her "smoothed her" out. On the second, the police were summoned; and on the third he was told to get out, which he did on June 5, 1960, and went to live at the Fairfax Road house, where he still resides. (Additional facts from testimony will be added later.)

Ten days thereafter, on June 15, 1960, the wife filed suit for an absolute divorce, alleging desertion, in 1953, of her by her husband. The husband answered and filed a cross-bill praying an absolute divorce on the ground of constructive desertion. The case came on for trial on May 18, 1961, before the same Chancellor who sat in the instant case. Before the taking of the testimony in that case was started, in response to questions

from the court, the husband signified not only his willingness but his desire to become reconciled. However, the wife was adamant. She stated that her husband had told her that he wanted to see her die in the gutter (a statement denied by the husband), and "[she would] rather die in the gutter than go back with him." (She has maintained this attitude consistently, as will be seen later.) The Chancellor denied a divorce to either party, expressing his hope that the parties would reconcile their differences and stating that he was "persuaded by the sincerity of the husband in this direction since their separation."

The case at bar was instituted by the wife in January, 1963, alleging that the parties had voluntarily separated on June 5, 1960. By stipulation, the entire proceedings in the prior case was admitted as evidence herein.

The Chancellor took the position that, since the previous case was determined on the questions of desertion and constructive desertion and the present one was predicated upon a voluntary separation, the plaintiff (as well as the defendant) should be limited in her proof to matters that had occurred after May 18, 1961, the date of the former hearing. The appellant complains bitterly because of this action of the Chancellor, and his conduct in voluntarily giving advice upon personal matters to one of the witnesses from the Bench. It may well be that in view of this Court's decisions in *Hahn v. Hahn*, 192 Md. 561, and *Matysek v. Matysek*, 212 Md. 44, that the Chancellor was too restrictive in limiting the testimony to matters occurring after May 18, 1961. (But compare *Misner v. Misner*, 211 Md. 398.) And there certainly is no requirement, nor is it desirable, that the Chancellor offer "extra-mural" advice upon personal matters to witnesses while they are testifying.

However, we do not feel that any prejudice resulted to the appellant because of the conduct complained of above. The advice to the witness had absolutely nothing to do with the outcome of the case. And the testimony as to events occurring before May 18, 1961, which the appellant desired to offer, all related to an attempt to establish that the separation of the parties was voluntary at its inception on June 5, 1960. For the purposes of this case, we shall assume, without deciding, that the parties voluntarily agreed to separate as of that date.

It is conceded that they have lived separate and apart since that time. Hence the critical, and only, question left to be answererd is whether the Chancellor was clearly in error in finding that "the testimony at the first hearing, as at the hearing on this cause, indicates the vindictive and unreasonable attitude on the part of the wife, and the court is still impressed with the sincerity of the husband in his efforts, not only to make a good home for his wife and daughters over the years, but *his continued efforts up to this time to reconcile this marriage* [italics ours]." For the cases make it abundantly clear that where a separation of a husband and wife begins as a result of a voluntary separation, and one spouse makes, before the expiration of the statutory period, a bona fide offer to the other spouse that marital relations be renewed, it destroys the voluntary nature of the separation. *Moran v. Moran,* 219 Md. 399.

We cannot say the Chancellor was clearly erroneous in his ruling. Maryland Rule 886 a. We shall not repeat all of the evidence bearing on the questions of the husband's good faith in offering, on many occasions, to become reconciled. The wife admitted she told him to get out; that she asked him for a divorce when he visited her after the first hearing; and that she wrote him on January 11, 1962, stating that she intended to get a divorce and asked him in the letter, "Why do you want me to remain your wife?" She also stated at both hearings that she did not desire to become reconciled, admitting that she had not loved her husband since about 1953. After the separation she had her telephone changed to an unlisted one, and kept her door locked.

After the separation (before, at, and after the first hearing) the husband made overtures to become reconciled, both by personal visits to her and by letters. She has always had a key to his residence. At both hearings, he stated that he was not only willing, but desirous, to resume marital relations. The only conditions that he requested for a reconciliation were that he and his wife should be "partners"; that they should hold their properties on a "50-50 basis"; that they both should obey the "Golden Rule"; and that he should have free access to all portions of the home and be treated with respect as a head of a family. Viewing the history of the case as we have outlined it

above, these were, we think, not unreasonable conditions under the circumstances.

The Chancellor who saw and heard the witnesses concluded that the husband's offers were sincere and bona fide, and, as stated above, we cannot say he was clearly in error. The decree will therefore be affirmed.

*Decree affirmed, appellee to pay the costs.*