## ARCHIE GUY MILLER *v.* A. VIRGINIA MILLER

[No. 43, January Term, 1940.]

*Decided March 5th, 1940.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Linwood L. Clark,* for the appellant.

*Eugene P. Childs,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Archie Guy Miller and A. Virginia Miller, both of Annapolis, appellant and appellee respectively, were married in 1913, and, except for short periods, lived together until August, 1931, when they separated, and from that time they have lived apart.

On March 13th, 1939, Mrs. Miller filed the bill in this case against her husband, praying an absolute divorce and temporary and permanent alimony, on the ground of abandonment. Miller filed a cross-bill against her, praying an absolute divorce on the ground that the parties had voluntarily lived apart for five years, and that the separation was final and beyond hope of reconciliation. Miller answered the bill and denied that he had deserted his wife, and she answered the cross-bill and denied that the separation was voluntary.

At the conclusion of the trial the court, in its decree passed on October 6th, 1939, dismissed the cross-bill, granted an absolute divorce to the wife, and awarded her alimony at the rate of fifty dollars a month accounting from March 15th, 1939, allowing the husband to pay the alimony in arrears in monthly instalments of twenty-five dollars. From that decree the husband appealed.

Both parties agree that they should be divorced, but they differ as to the ground for that relief.

The wife contends that the husband left their common home against her will and her wish and has since continued to live apart from her, that he left with the intention of terminating finally the marriage relation, that there was no just cause or reason for his desertion and that the separation is beyond any reasonable hope or expectation of reconciliation.

The husband contends on the other hand that they separated and have been living apart voluntarily and by common consent, but concedes that the separation is final and beyond any reasonable expectation of reconciliation. So that the issue is, Was the separation voluntary as to both, or involuntary as to her?

Briefly, the facts of the case are these: Miller is a postman, and has been in the postal service for thirty-one years. In that position he receives $2,100 a year less 3 per cent and he also receives $125 a year as secretary of a fraternal organization. His wife is a seamstress and dress maker, and at one time conducted a dress shop, and after it failed continued to work as she was able as a seamstress.

They have two children, one, Oliver, now twenty-five years of age, is married and self supporting, the other, Marian, is employed in Washington and is also self supporting. Mrs. Miller seems to have been an industrious, faithful, wife and mother, she said that until the separation she loved her husband, and there is nothing in the record to cast doubt on the sincerity of her statement. She helped to educate their children by her own labor, she was tolerant of her husband's faults, and appears to have made an earnest effort to keep the little family together.

Miller is an honest, sincere, man with an impossible disposition, and a capricious temper. He contributed liberally, as his means permitted, to the support of his wife and family, he went in debt to open the dress shop for his wife, there is nothing in the record to show that he was unkind to his children, but for some undisclosed reason there was for years more or less bickering and

quarreling between him and his wife. He left the home on two occasions prior to the final separation and returned each time at his wife's solicitation, but the record is silent as to why he left, and as to the circumstances under which he left.

In August, 1931, Oliver was some sixteen or seventeen years of age. He had a friend, a midshipman, Morris Burton Brown, whom he had met at Sunday School, Brown was interested in the Boy Scout movement, and apparently enjoyed helping children. Oliver asked his mother whether he might bring Brown to their home, she gave him permission to do so, and from that time Brown was a not infrequent visitor at the home, not infrequently remained overnight, and indeed staid there for considerable periods of time. It does not appear that Brown knew that his visits were unwelcome to Miller, Miller said nothing to him about it, he appears to have been interested in the children and occasionally helped Marian, then about eleven or twelve years old, with her lessons.

For some obscure reason Miller took a violent dislike to Brown, and while it does not appear that he said anything to him directly, he did take out his displeasure at his presence in the home on Mrs. Miller.

On one occasion, on a Sunday morning, while Miller and his wife were in bed, Brown, who slept with Oliver, passed the door on his way down stairs, and his wife, so Miller said, waved her hand to Brown as he passed the open door. Her gesture offended Miller, he upbraided her, and an altercation followed. The parties differ in their statements of what followed that incident. Mrs. Miller said that on one Sunday night her husband came home while she was asleep in bed, and without any warning kicked her out of bed and struck her, and that similar occurrences had happened many times before, that on the following morning he apologized, and she told him she had reached "the end" of her rope and could not continue living that way. She then gave this testimony:

16

"Q. How many times were you separated?  A. Two others.  Q. What were the causes of the last separation? A. Well, Mr. Miller had really treated me very cruelly at this particular time, and I realized from that moment I could not go on living with him even though I wanted to.  I just realized I couldn't.  Q. Could you state what the cruelty was?  A. Yes.  He came home and, as I remember, he kicked me out of bed and then hit me. The next morning, for the first and only time in all our married life, he said he was sorry for anything he did to me.  Q. Had this happened before?  A. Oh, many times.  Q. Did he give any reason for kicking and hitting you?  A. He had been accusing me of a great many things that were absolutely untrue.  Q. Did he accuse you at that time?  A. That night when he came home I was asleep, and he kicked me out of bed without saying anything.  Q. What time of night was it?  A. I really don't know.  I was asleep when he came in. * * * Q. Then this had happened before?  A. Oh, many times.  The following Wednesday he moved to the Elks Club, and that was the last separation.  Q. He moved from where?  A. 203 Main Street to the Elks' Club.  Q. Then he stayed in the house from Sunday until Wednesday?  Q. Did he tell you he was going?  A. Yes, he told me he was going.  As I remember correctly, he said we can't go on this way, the sooner he left the better.  Q. Has he ever since that time attempted to make any reconciliation?  A. No.  Q. Has he ever been back to your house since that time?  A. No. He never has been back and I wouldn't ask him to come back, because on other occasions it was through my persuasion that Mr. Miller returned home the other two times.  Q. And you felt it best not to approach him this time?  A. I did."

Miller's version is different.  He said that one night, some time after the Sunday morning on which he had seen his wife wave to Brown, he and she were in bed, and that following an altercation concerning that incident he pushed her from the bed with his foot.  He testified:

"Then she finally admitted to me that she did wave her hand and gave me some intangible reply as to why she did it which did not meet with my approval whatsoever, and in the end the whole thing resulted in my taking my foot and pushing her out of bed, and I may have said 'Get to hell out of my bed.' * * * Q. Were you ever guilty of any brutality toward your wife? A. Well, if it may be, in consideration of that question, it would be possible, depends on what you call 'brutality.' If pushing her out of bed with my foot is 'brutality,' then I was brutal to her. Q. That was the extent of your actions against her? A. That's right. * * * Q. You testified you took your foot and pushed your wife out of bed. Is that right? A. Yes. Q. You heard your sister testify on the stand? A. I did. Q. How do you think your wife got those bruises? A. It may have been when she fell to the floor she may have struck something. Q. Was your kick strong enough to make her fall to the floor? A. She went out of bed. Q. You did not hit her? A. I did not hit her with my hand or my fist, if——. Q. If she got those bruises she got them from other sources? A. I did not say that, I said she might have gotten them from falling on the floor, or it may have been caused by my pushing her from the bed."

Oliver, the son, went in the room while his mother and father were both there, and he said he could see that she had been hit, and that before he went in he had heard an argument. Marian said that she was awakened by the "commotion," and that the next morning she saw that her mother's arm was bruised. Caroline Elizabeth Duvall, Mrs. Miller's sister, testified: "Well, that morning when I went in the store—I was helping my sister in the store at the time—she was a sight to be seen. Her eye was black, her arms were blue. I asked what in the world had happened, and that's when she burst out and told me. She had a huge bruise on her leg that couldn't be seen by the world, but the eye and the arm could, most assuredly."

Miller testified that after the occurrence "I did not want that man in my home any more, I wanted her to get rid of him, I did not trust him, I did not want him there; my daughter was eleven and a half years old and he was running around in his pajamas, he had his own suit there, he came in and changed his clothes and made use of my home same as his own. I did not trust him in my home and I told her so, and I wanted to be rid of him. She insisted he was not her guest,—he was not mine—I did not know him until I met him in my home, I told her to get rid of him, and I would give her ten days to get rid of him, in which to make up her mind he would not come back to my home again. * * * On the occasion when I told Mrs. Miller I would give her ten days in which to forbid this man to return to my house, if he returned again I would leave, it was either a question of him being in my home or a question of myself and she said to me 'well, if you want to go, go on and go, but you are going to have to take care of these children,' and I said 'I expect to do so.' " He then said that on the tenth day after that he came home and found Brown eating supper, that he then packed his suit case, went to the Elks' Home, and did not thereafter return to his home. He did not see his wife on that occasion, and it appeared that Brown was invited to the home not by Mrs. Miller, but by Oliver, although she knew that Oliver intended to invite him.

Out of the confused jumble of facts which bulked so large in the lives of these people, one is definitely and conclusively established, that Miller did in August, 1931, leave the common home, and that since that time he has not returned to it, and it also appears without contradiction that since then neither he nor she has made any effort to effect a reconciliation. After the separation he contributed at first $75 a month to the support of his wife and children, then for a time $70, from 1932 or 1933 until this suit he paid $50 a month, and before this suit notified her that he would reduce the amount to $15 a month.

There is nothing in the evidence which justifies Miller's ugly suspicion that the relations between Brown and Mrs. Miller were anything more than the friendly interest of an older woman in a friend of her children, and the not unnatural attraction which the intimate and informal relationship of a home had for a friendly boy who was far from home and living in the ascetic and formal atmosphere of a great naval college.

Whether Miller's unprovoked assault on his wife would have justified her in leaving him is not a material inquiry here, for it certainly did not justify his leaving her. Nor is there any reason or substance in the excuse which he does give for deserting her. He said that he warned her that if Brown returned to the home after ten days he would leave, that Brown did return, and he left.

Within reasonable limits the husband, as the head of the family, has the right to say who shall or who shall not visit the home, *Jacobs v. Jacobs*, 170 Md. 405, 410, 185 A. 109; 30 C. J. 510; *Crouch v. Crouch*, 150 Md. 608, 133 A. 725, and while the absolute quality of that right had been much modified since *Evans v. Evans*, 1 Hagg. Con. 36, 161 Eng. Reprint 466, nevertheless the right of the husband to exclude from his home persons who are offensive or obnoxious to him ought not to be doubted. It does not follow, however, that the right is so peremptory and imperative that the mere temporary presence of a visitor who enters the home with the wife's implied permission, but not at her request or invitation, to visit another member of the household, will justify the husband in deserting his wife, even though the visitor is unwelcome to him. He was the head of the family and if he objected to Brown's presence he himself should have told Brown so; he had no right to impose upon his wife the unwelcome and humiliating duty of informing either Brown, or her son Oliver, who invited Brown to the home, that he must not come there because her husband thought there was some impropriety in the relationship between her and Brown. It is consistent with the record that Brown was respectable, honest, and decent,

20

that he visited the home as a friend of Oliver and of the family, and while the wife's rights in the regulation of the household were subordinate to those of the husband, she was neither a menial nor a servant, and he had no right to require her to insult an inoffensive guest by telling him that he must not enter the home. It was Miller who objected to Brown's presence, and if he wanted Brown to know that, he, Miller, was the person to tell him so.

The insinuation that Brown's casual presence at the supper table was the reason why Miller left his wife is so fantastic and absurd as to suggest that it was a mere excuse for conduct which was inherently indefensible.

It may therefore be assumed that Miller separated from his wife without legal justification and that he has continued to live apart from her for more than eight years, that while he contributed to her support during that period he made no effort to effect a reconciliation, and at no time manifested a willingness to resume marital relations with her.

The separation was involuntary as to her, because she could do nothing to prevent it, she did not consent to it, she said positively that it was not voluntary as to her, and that statement is not contradicted. She did, it is true, accept support from the husband during the separation, but it cannot be inferred from that that she consented to the separation, because in accepting support she only took what the law would have given her had her husband refused to support her and their children.

The appellant contends, however, that the wife's consent to the separation may be inferred from her failure to try to woo her husband back to the home, and from her alleged reply to his threat to leave, "well, if you want to go, go on and go, but you are going to have to take care of these children." That expression should not be construed as a consent to his leaving, but rather as notice that if he carried out his threat he could not expect to escape his obligation to support his wife and children.

She could not prevent his leaving, and her statement was no more than the acknowledgment of the inevitable, a mere expression of her resignation to circumstances which she could neither prevent nor control; it certainly was neither a condonation of his purpose nor an excuse for it.

After humiliating his wife with false accusations, pushing or kicking her from her bed, bruising and wounding her, and announcing that he intended to leave her unless she forbade Brown to enter the house, he could not expect her to beg him to remain, especially as it does not appear that she had ever invited Brown in it. 3 *A. L. R.* 503.

It is said in 17 *Am. Jur.*, 200: "Where a husband or wife wilfully and wrongfully deserts the other, the willingness for, or tacit acquiescence in, the desertion on the part of the deserted spouse will not defeat the cause of action if such wilful desertion is obstinate and continued for the statutory period. The mere fact that a man whose wife was dissatisfied and self-willed succumbed to the inevitable and permitted her to leave his home after reasonable remonstrance and attempt to persuade her not to go does not show that the separation was mutual so as to bar his right to a divorce."

Repeatedly in her testimony she said that as to her the separation was involuntary, as will appear from these quotations: "During all the eight years you have been separated, and at the present time, this separation—has it been voluntary? A. I would say no, not on my part. Q. For the past five years has the separation been voluntary? A. Not on my part. Not on my part ever. * * * Q. You could not truthfully live with Mr. Miller and feel that you were doing justice to yourself. When did you first feel that way? A. Well, many years ago. I couldn't tell you exactly the day. Q. While you were living together? A. No. Q. Have you felt ever since you have been separated that you couldn't live together again? A. No, there have been times when I wished he could see the light and come home to us, many times. * * * Q. Can

you give us any reason why, if you were anxious for him to return to you, that during this entire period of about eight years you never wrote him a letter and never suggested that he return to you? Can you give any reason for that? A. I can. I had, as you remember I stated, that twice before through my persuasion he returned home, and I just made up my mind I would not do it again. I felt it was no use. I had given up. He could come home willingly and not by persuasion the third time."

Miller on the other hand never at any time expressed any desire or willingness to return to the home.

Nor was she obliged to seek Miller out to entreat him to return to his home. He knew where it was, he left it voluntarily, he had left on two former occasions, and she had persuaded him to return, he made no effort to effect a reconciliation, apparently he wanted none, and it should not be assumed that because she failed to ask him to return she agreed to the separation. The duty of attempting to effect a reconciliation was upon the husband who without justification deserted his wife, not upon the wife whom he deserted. *Simmont v. Simmont,* 160 Md. 422, 425, 153 A. 665; 17 *Am. Jur.* 210, 211.

Since Miller left his wife and his home voluntarily, without justification and with the deliberate intention of terminating the marriage relationship against her wish and her will, and has deliberately and intentionally lived separately and apart from her for more than eight years, without making any effort at reconciliation or manifesting in any way his willingness to resume marital relations, and admits that the separation is beyond any reasonable expectation of reconciliation, it follows that she was entitled to a decree of divorce *a vinculo matrimonii.* Code, art. 16, sec. 38.

Counsel for the appellant has urged with force and earnestness a different view upon the court, but one which for the reason stated in it unable to accept.

A necessary consequence of that conclusion is that appellant's cross-bill for a divorce on the ground of volun-

tary separation for five years under the "Five Year Separation Statute," chapter 396, Acts 1937, was properly dismissed, since if the original separation was involuntary as to her, and so remained throughout its duration, that statute has no application. *Campbell v. Campbell,* 174 Md. 229, 236, 198 A. 414; *Chabeaux v. Chabeaux,* 164 Md. 370, 165 A. 301; *France v. Safe Deposit Co.,* 176 Md. 306, 4 A. 2nd 717.

In the absence of any objection in this court as to so much of the decree as dealt with the allowance of alimony, the propriety of the allowance will be assumed without consideration.

Finding no error in the decree from which the appeal was taken, it will be affirmed.

*Decree affirmed, with costs.*