## JESTER, ETC. *v.* JESTER

[No. 97, September Term, 1966.]

*Decided April 5, 1967.*

*Motion for rehearing filed May 4, 1967, denied May 4, 1967.*

164

The cause was argued before HAMMOND, C. J., and MAR-BURY, OPPENHEIMER, McWILLIAMS and FINAN, JJ.

*John H. Garmer,* with whom was *Nolan P. Chipman* on the brief, for appellant.

*Austin W. Brizendine* for appellee.

MARBURY, J., delivered the opinion of the Court.

Appellant, wife, filed a bill of complaint in which she alleged abandonment and desertion by appellee, husband, and in which she sought temporary and permanent custody of the infant child of the marriage, alimony, support and maintenance, costs and counsel fees, and a declaration that a purported agreement between the parties dated October 10, 1964, was null and void. The husband answered and filed a cross-bill in which he sought custody of the infant child. The chancellor entered a decree which declared that the agreement between the parties was null and void; which found that the wife had deserted the husband without just cause on October 10, 1964; and which denied the wife the custody of the child and support and maintenance and awarded custody of the child to the husband.

Appellee and appellant first met in Ankara, Turkey, in July 1963. Appellant, who was then nearly seventeen years old, was living with her mother and her father, an Air Force sergeant stationed in Turkey. Appellee was also serving in the Air Force and was stationed in Turkey. Appellant returned to this country with her parents in December 1963. Appellee followed when he was discharged from the Air Force on February 4, 1964. The parties were married on February 15, 1964, in a religious ceremony in Towson, Maryland.

After their marriage, the parties lived with the husband's parents in Lutherville, Maryland, until June 4, 1964, when they moved into the first floor of a duplex which they bought on St. Dunstan's Road. Appellant paid over three-fourths of the down payment. This apartment was ten to fifteen miles from the home of appellee's parents.

On July 22, 1964, the only child, a girl, was born. Appellant testified that whenever her mother-in-law visited her, which was often, the mother-in-law would criticize her methods of caring for the baby; and she would completely take over the baby while she was there. She criticized the appellant in front of appellee and informed him that his wife did not have the brains to take care of the child. Appellant described herself as being upset by the birth of the child, by the adjustment to her new life, and by the constant criticism of her mother-in-law. Decisions affecting the family, such as the purchase of a new car, were made by appellee and his mother without consulting appellant.

Early in September 1964, the wife received word from her mother that her grandmother who lived in Houston, Texas, was ill. Her mother suggested that the wife, the husband, and the baby visit the grandmother, since the grandmother had never met the husband, nor had she ever seen the baby. Appellant stated that her husband was initially receptive to the visit. He applied for a loan at a bank and requested the use of his parents' automobile, but his parents objected to both the loan and the use of the car and he acceded to their wishes. Appellant's mother sent money for the three of them to make the trip to Houston. Appellant testified that some time immediately prior to October 10, 1964, a decision was made that appellant would visit her sick grandmother alone and that appellee purchased a one-way train ticket for October 10, 1964, to Topeka, Kansas, where her parents were then living. Appellant was to meet her parents in Topeka and then drive to Houston with them to see the grandmother. Her husband told her that if she wanted to return home her parents or her grandmother would have to pay her way back.

On the morning of October 10, 1964, appellee's mother suggested to appellee that the parties have some kind of separation agreement drawn by a lawyer. After calling for his wife at a beauty parlor, he took her to his lawyer's office to have the agreement drawn. The agreement signed by the wife provided for the waiver of her dower rights, of alimony, and of the custody of the child. The wife testified that her husband said that he was having the agreement drawn in case she did not

return. She stated that she interpreted this to mean that the purpose of the agreement was to prevent their parents from taking over their home in case she was injured or killed while traveling. She testified that there had been no discussion of a separation other than her brief trip to visit her grandmother. She understood that the agreement would be destroyed upon her return. That afternoon, about three o'clock, her husband put her on the train for Topeka.

On October 13, 1964, appellant telephoned appellee and told him that she would be returning the next Tuesday. She testified that he said "Don't bother to come, Karen [the infant child] and I are much happier without you." The following weekend, October 17, 1964, appellant and her father drove to Lutherville, Maryland, where the home of the appellee's parents was located. She testified that she asked appellee to let her come back and resume living together but that he refused. Appellee testified that when his wife stated that she wanted to return, he asked her if that was what she really wanted to do. Her reply, according to appellee, was that she said she wanted to return only because that was what her mother wanted her to say. That night, appellant and her father stayed in the duplex apartment. The next morning, a trailer was rented and appellee, his father, and appellant's father loaded it with the things that both appellee and appellant had divided that morning. Appellant and her father then returned to Topeka taking with them her clothing and some furniture.

One week later, appellant again returned, alone, and visited the home of her husband's parents. She stated that she had returned upon the advice of her lawyer in Kansas, and she again asked appellee to let her come back. He refused since he felt that she was insincere and had returned only because of the pressure put on her by her mother. Appellant left the same day and returned to Topeka.

Between October 24, 1964, and August 31, 1965, when appellant returned to Maryland with her mother, appellant testified to numerous telephone conversations with appellee in which she sought resumption of the marriage, but the resumption was refused by appellee. Appellant wrote several letters to her husband during this period. In those letters she expressed her love

for the child and her husband and asked that she be allowed to return and start their life anew. In one letter she asked that he not rent their apartment because she wanted to come home to be with her child and husband. At the suggestion of her lawyer, appellant made copies of those letters. Appellee testified that in November 1964, he wrote to appellant stating that he was no longer responsible for her; that he decided, in approximately March 1965, that he did not want her to come back; and that this decision was never communicated to appellant. Appellant and her mother visited the home of appellee's parents briefly on August 31, 1965, for the purpose of seeing the baby, which they did, but appellee refused to allow appellant to hold the child. Immediately thereafter these proceedings were instituted.

The chancellor found the agreement of October 10 to be null and void on the ground that it was not the intention of either party that they would be controlled by the terms and provisions of it and that it was not, at the time of its execution, expected by either to represent and constitute an agreement with respect to their property rights. However, he found that although the agreement had no legal force, it was important evidence regarding the nature of appellant's intentions when she left her husband on October 10, 1964, to go to Topeka. This, coupled with appellant's subsequent actions and those of her mother, who, it was claimed, had forced her daughter to return to her husband, demonstrated that at the time appellant left and at all times through and including her returns in October 1964, her intent and purpose was to leave her husband and her child. He also found that appellee did not give appellant just cause or reason for the desertion of himself and daughter. Appellee has not cross appealed nor has the appellant appealed from that portion of the decree holding that the agreement was null and void.

Abandonment and desertion require an end to cohabitation and an intention to desert. *Applegarth v. Applegarth,* 239 Md. 92, 210 A. 2d 362; *Zulauf v. Zulauf,* 218 Md. 99, 145 A. 2d 414. Appellant and appellee have not cohabited since October 10, 1964. The chancellor found that the intention of appellant when she went to Kansas on October 10, 1964, was to desert her husband and child. Our review of the record indicates to

us that the chancellor's finding that appellant intended to abandon her husband and child was clearly erroneous. Maryland Rule 886 a.

The record demonstrates the effect of a well-meaning, but domineering mother-in-law who interferes in the marriage of a son or daughter. Appellant, a seventeen year old girl, was married to a man about twenty-one years old at the time of trial. It appears that neither of them had adjusted to their respective lives in Turkey, and a short time after their arrival in this country they were married. The parents of both gave the couple as much help as possible. After the baby was born, appellee's mother visited often, and when she did she took over the care of the child. Several times during the two and one-half months appellant had the care of the child, appellee's mother criticized appellant and berated her in front of her husband. Appellant testified that the criticism of her mother-in-law, on top of her adjustment to married life and the birth of her child, made her extremely nervous and upset. Appellee relied heavily on his mother's advice. His decisions were made at her prompting. He testified that he thought his mother could care for the child better than appellant because of his mother's experience and love for the child. Appellee's mother suggested the separation agreement. It appears that she directly influenced her son in sending his wife alone on a one-way ticket to Kansas.

Appellant's mother, who was also well-meaning, nevertheless had considerable effect upon the parties' problems. When she learned that her daughter had signed an agreement purporting to give up the child, she sent appellant back to Maryland with a set of written instructions to show affection and love for appellee and the child in order to make a favorable impression.

It is clear from the testimony of both appellee and appellant that at the time appellant left for Topeka the separation was to be brief. Appellant testified that the separation was only for the purpose of a visit. Appellee testified that the separation was for the purpose of reflection upon the marriage. Not until March 1965 did appellee consider the separation to be absolutely final, although he did tell his wife over the telephone a few days after she had left that he and the child were happier without her. During the period between the separation and the trial, appel-

lant returned several times to renew the marriage, but because of her mother's influence upon appellant, appellee refused reconciliation. Appellant wrote letters of supplication to her husband and sent presents to her child. Appellee gave appellant no real opportunity to demonstrate the sincerity of her offers, none of which were burdened with improper qualifications or conditions, to resume the marriage. Although appellant appears to have been dominated by her mother, the evidence is not sufficient to show that appellant was insincere in her efforts at reconciliation.

The chancellor relied heavily on the separation agreement which he found indicated that appellant's intention in going to Kansas was to desert her husband and child, although he found that it was not the intention of either party to be controlled by the agreement and that it was a nullity. The appellant's misunderstanding of the effect of the agreement, the circumstances under which it was executed, and the intention of the parties that it not be controlling not only nullify its legal effect, but also emasculate it of any evidentiary value as to the intention of the parties concerning the separation.

Having found that the appellant did not intend to abandon her husband and child when she left for Topeka, and in light of her attempts at reconciliation, we conclude that the evidence was not sufficient to support a finding that she deserted her husband and child. See *Applegarth v. Applegarth,* and *Zulauf v. Zulauf,* both *supra.*

The apparent cause of the separation was the overbearing and continuous influence of the in-laws, the youth of the parties, and their emotional immaturity. Where spouses are living apart without fault of either, or without legal grounds for separation, each is under a duty to make reasonable efforts to effect a reconciliation, and neither may charge the other with desertion as ground for a divorce unless he or she has in good faith made such an effort. If one spouse makes such an effort and the other refuses without justification, the latter is guilty of desertion. *Wysocki v. Wysocki,* 185 Md. 38, 42 A. 2d 909; *Dearholt v. Dearholt,* 178 Md. 405, 13 A. 2d 538. On the facts in this case, this well-established principle remains undisturbed by the recently enacted Section 26A of Article 16, (Chapter 147 of

the Laws of 1965), which must be considered because to be entitled to separate maintenance in this State one must show facts which would entitle one to a divorce either *a vinculo* or *a mensa. Wathen v. Wathen,* 245 Md. 684, 226 A. 2d 350; *Moran v. Moran,* 219 Md. 399, 149 A. 2d 399. Section 26A states only that an offer of reconciliation not concurred in by the other spouse shall not of itself be a defense or a bar to a divorce. However, it does not relieve a person who has no grounds for obtaining a divorce from the obligation of accepting an offer of reconciliation made in good faith by the other spouse. Refusal of the reconciliation attempt without justification continues to make the spouse refusing guilty of desertion.

Three days after appellant left for Topeka appellee told his wife over the telephone that she need not return. When she did return to seek reconciliation, he told her that it just would not work without giving her any explanation of why it would not work. He gave her no opportunity to prove her sincerity. He testified that he was afraid to do so since he thought she would run off with the baby after a few days. He refused to answer her letters requesting that he take her back. On November 25, 1964, he wrote appellant a letter telling her that she was no longer his responsibility, thus she need not expect him to send her any money. Finally, in March 1965 he decided that he did not want her back even if she sincerely desired to return.

Thus, the wife sought reconciliation in good faith and when the husband without justification refused, his refusal constituted desertion from the time of the refusal. *Smoot v. Smoot,* 200 Md. 216, 88 A. 2d 465; *Miller v. Miller,* 185 Md. 79, 42 A. 2d 915.

Appellant, having shown evidence sufficient to entitle her to a divorce a mensa et thoro by reason of the husband's desertion and abandonment, should have been awarded separate maintenance. *Wathen v. Wathen; Moran v. Moran,* both *supra.* The decree will be reversed on this point and the case remanded for determination as to the amount of support and maintenance to which she is entitled.

As to the custody of the child there is nothing in the record which would contradict appellant's fitness as custodian of the child. Appellee testified to one or two instances in which he

thought his wife had not properly cared for the infant. Other witnesses testified that the child was generally well cared for by appellant. There was no investigative report on the conditions of either party's present home in which the child would be raised, on the ability of either party to provide the necessary care and comforts for the child, or on the present emotional status of the child and parents. See *Palmer v. Palmer,* 238 Md. 327, 207 A. 2d 481. Under these circumstances the portion of the decree dealing with the custody of the child must be remanded without reversal or affirmance for a plenary hearing in which the chancellor, in making his determination as to where the best interests of the child lie, should require such investigative report and recommendations and cause the production of such testimony and other evidence as may be necessary for a fair hearing. Cf. *Crump v. Montgomery,* 220 Md. 515, 154 A. 2d 802; *King v. Shandrowski,* 218 Md. 38, 145 A. 2d 281.

> *Decree affirmed in part, reversed in part, and in part neither affirmed nor reversed and cause remanded for further proceedings in accordance with this opinion. Costs to be paid by appellee.*