## HEATH *v.* HEATH

[No. 242, September Term, 1967.]

*Decided May 29, 1968.*

*Motion for rehearing filed June 24, 1968; denied June 28, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS and FINAN, JJ.

*Joel H. Pachino,* with whom was *George D. Edwards* on the brief, for appellant.

*Harry S. Shapiro* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

We descend reluctantly into this labyrinth; but, descend we must, since we think the trial judge's finding that the separation

of the parties was not voluntary is clearly erroneous. We think also that *Matysek v. Matysek,* 212 Md. 44, 128 A. 2d 627 (1957), is controlling rather than *Lewis v. Lewis,* 219 Md. 313, 149 A. 2d 403 (1959).

The Heaths were married in 1941 and this seems to have been the last thing they agreed upon, until their separation in August 1962. The appellant (Raymond) was absorbed by the armed forces shortly after the marriage, returning in December 1945. Their son and only child, Donald, was born in 1948. Raymond said the appellee (Elizabeth) wanted no more children and that she procured the interruption of a second pregnancy in 1952. This was not denied.

The true flavor of home life with the Heaths can best be conveyed by pondering the following excerpts from the testimony. We shall begin with Raymond:

> "In 1948, my son was born. Had it not been for him, I would have been gone many years ago."
>
> * * *
>
> "We never got along at any time. She constantly harassed me. She was just completely unbearable to live with. I have never had a police record in my life, either civilian or in the Service. * * * she would throw food off the table; say I am going to go get the police and tell them that you did this."
>
> * * *
>
> "I prepared our meals for my son and I, and I washed and ironed his uniforms while he was going to Shrine of the Little Flower School. I have done so ever since."
>
> * * *
>
> "It got so that I—she told me to get out of the bedroom, which I did. She threatened my life. I had a lock and key on my son's bedroom door, and this is where I resided from 1960 until August of 1962, when she kept telling us again to get the "H." out, both my son and myself, and as I said, it was so unbearable, I just had to get out."
>
> * * *
>
> "Your Honor, I don't know if I am in order, but I

would prefer death than to have to go back and live under the same conditions that I lived with that woman."

What follows is from the testimony of Donald:

"Well, she told my father many a time that she wanted him out of her bedroom, so then he came in with me in my bedroom, and well, she had been up all night long, yelling and beating on the door, and hollering, and like my father would have to go to work the next day, I'd have to go to school, and this was going on for two years before we finally left, and she told us many a time, even before my father came in the bedroom, that she didn't want either of us."

\* \* \*

"If you want dates, I would say in 1959, at least five times; '60, I'd say ten times; up to '62—I mean, I have heard the same thing at least twenty times, that she wanted my father and I out of the house, that she couldn't stand living with us. She even told me that she wanted me to go live with my father, and well, this was just going on, and on, and as I said, she was keeping us up all night, and she said she couldn't stand living with us, and the only thing that would satisfy her was for us to leave, so then finally, my father, you know, told me that we'd go out and stay at my grandmother's house."

\* \* \*

"Well, there were many arguments. I mean, it was a day to day thing."

\* \* \*

"Well, she didn't cook for us; she didn't do our laundry, and in other words, she just—she couldn't get along with either of us in the house. My father had to take care of the house, plus cook, do the laundry, do everything that a housewife would normally have to do."

\* \* \*

"\* \* \* as time went on, I was visiting my mother every once in awhile \* \* \* it used to be about once a

week, and then I finally slacked off, because I told her many a time when I went over there, that I didn't come over there to hear about how miserable and rotten my father was, and she would just pine on this all the time."

\* \* \*

"Yes, sir, I mean, this was going on for years, and years. It wasn't—it didn't just start in the past five or six years."

Dorothy Ziegler is Raymond's sister. Excerpts from her testimony follow:

"Betty would bring Donald down to my house and leave him \* \* \* and when I would take him home \* \* \* she would be in a very vulgar tone of voice at me, 'Take him home, take him home; I don't want him and I don't want your brother; take them out of the house.' This hasn't happened on one occasion; this has happened on numerous occasions, ever since the child has been a very young boy."

\* \* \*

"He [Raymond] has always been a father for that boy. He has done grocery shopping; he brought the groceries home. \* \* \* I was returning the boy back home that day, that he was left on me. She was throwing groceries out on the front street."

"I was out there one night, when she was throwing the groceries out. I said 'Betty, try to calm yourself down and get along.' 'I don't want your brother; I don't want your nephew.' I mean, it was very obvious she didn't. She never washed for the boy.

"Q. Do you know when this took place? A. This was before 1962; yes sir, I will say that.

"Q. Are you able to pin-point closer the time; would you pin-point the time closer? A. Sir, it happened so much, that really, I could say three times a week, since the boy has been on earth, since Donnie has been on earth, I could say three times a week that I'd babysit for him, and was left with that child, when my brother was working."

Elizabeth's testimony, as might be expected, develops a some-what different theme:

> "[He] refused to support me. He told me he had an-other wife; he had sex affairs * * * He kept beating on me. I had to go to Court many times with bruises, but it was dismissed because I had no witness to the fact and Mr. Heath would not allow Donald to come into the room while he was beating on me. * * *I had had him arrested on numerous occasions. He tore my dress on New Year's Eve, and the police had seen this. * * * these cases were always dismissed because there was no one who had seen him pounding on me."
>
> * * *
>
> "* * * he came home so late, and I had the food put away, and he'd start beating on me, and he'd as much as say, get the garbage out, pull the garbage out."
>
> * * *
>
> "He'd push me around, punch me in the arm with his knuckles. I was constantly bruised."
>
> * * *
>
> "Q. Did you order him out of the house? A. No."
>
> * * *
>
> "Q. Did you have any conversation at all with re-gards to his leaving. A. All he said was that he had another wife, that he was shacking up with, a woman, and I know he has."
>
> * * *
>
> "Q. You heard your son testify, did you not, that on several occasions you ordered him to leave? A. He is only repeating what his father has ordered him to say. His father is brain-washing him with a car."

On cross-examination she admitted that their home had been fully paid for when Raymond and Donald left, that he had paid the gas and electric bills, the water bills and all but one of the oil bills, and that he frequently had bought the food. She insisted Donald's testimony in another proceeding when he was only 14 years old, that he preferred to live with Raymond, was induced by a fear that 'the car *would be taken* from him"

but when she was reminded of his tender years, she said it was because "he was *promised* a car when he reached sixteen." (Emphasis supplied.)

In July, 1959, Elizabeth filed a bill for divorce a mensa alleging physical violence and "cruel and inhuman treatment" which "compelled [her] to leave their bedroom." She further alleged that their separation was the "deliberate and final act of" Raymond and that there was "no hope or expectation of a reconciliation." The case was not pressed beyond an order, dated 30 August 1960, awarding her "as alimony pendente lite, $32.50 per week for 24 weeks" or until the trial of the case.

In May 1963, she filed a bill for temporary and permanent alimony, the return and permanent custody of Donald (who, at the time, was living with his grandmother) and "a reasonable sum for [his] maintenance and support." She alleged "cruelty of treatment and excessively vicious conduct" and that he, Raymond, *"constructively* and *actually* abandon[ed] and desert[ed]" her. (Emphasis supplied.) "No hope or expectation of reconciliation" was also alleged. All this Raymond denied and, in his cross bill, alleged desertion and abandonment on her part. The master recommended $15.00 per week alimony pendente lite. On 17 May 1965 the court dismissed both bill and cross bill, without prejudice, and reserved judgment on the matter of custody "pending receipt of report of the Probation Department." No further action was taken.

Raymond filed his bill of complaint (the instant case) on 15 September 1966. He alleged they "mutually agreed to separate and go their own ways" in August 1962. Elizabeth, answering in proper person, denied the allegation. Later, on 11 April 1967, she employed counsel. The hearing was held on 11 May 1967. In August 1967 they (counsel) filed a petition asking for leave to withdraw, alleging Elizabeth refused to cooperate with them in the conduct of the case. Present counsel entered the case after it arrived in this Court.

The trial judge seems to have believed Raymond. He expressed no opinion in respect of Elizabeth's testimony. But he said "by no stretch of the imagination" is the separation voluntary. We do not agree. If Raymond's testimony, as corroborated by Donald and Mrs. Ziegler, is true, and we agree with what

the trial judge seems to have believed, then, it seems to us, the separation was indeed voluntary. What we said in *Matysek* seems apposite here. Chief Judge Brune, for the Court, said :

> "None of the above cases (nor any other which has come to our attention) holds that a voluntary agreement to live separate and apart *must be arrived at either with calmness and courtesy or without anger.* Courtesy certainly, and calmness probably, were lacking in the instant case, and in all likelihood anger was present. We think that a mutual agreement may be reached under such circumstances. The case which most nearly approaches the present case in the general tone of language used seems to be *Miller v. Miller, supra* [178 Md. 12, 11 A. 2d 630]. There the husband had threatened to leave the wife (for a reason which this Court found to be insufficient), and she replied 'Well if you want to go, go on and go, but you are going to have to take care of these children.' The husband claimed that this amounted to a voluntary agreement to separate. His contention was rejected because the wife's statement amounted merely to acquiescence in what she could not prevent. *That was not the situation in the present case. The husband demanded that the wife leave. She could have refused. Instead, she agreed and she did leave.*" (Emphases supplied.) *Id.* at 47.

It can scarcely be said that Raymond merely acquiesced in what he could not prevent. He said, it will be recalled, that he "would have been gone many years ago" if it had not been for the boy. He held on, he testified, until Donald grew up because he had been afraid custody would be awarded to Elizabeth. When he felt Donald "was old enough" he left. Despite her protests to the contrary we think it can be inferred from the testimony and other evidence that Elizabeth wanted very much to be separated. Indeed it is difficult to imagine a course of conduct better calculated to effect a separation than the one she pursued. That her determination to be

rid of Raymond was constant, relentless and obsessive in no way diminishes, but rather enlarges, the voluntariness of the separation on her part. Raymond's departure was certainly voluntary. He left when he wanted to leave. As was noted in *Matysek,* "they were glad to get away from each other."

The facts in *Lewis, supra,* relied upon by the trial judge, present a situation quite different from the one before us. Moreover, it was there held that there was a lack of corroborating evidence. We think the testimony of Raymond, in the case at bar, is amply corroborated.

Raymond contends the trial judge erred by considering excluded evidence in arriving at his decision. Elizabeth's one page brief does not discuss the point. What actually happened the record does not make entirely clear. During the cross-examination of Raymond counsel for Elizabeth offered in evidence the court file in the 1963 proceeding. Counsel for Raymond objected and suggested that the 1963 file ought not to be admitted without the 1959 file. Counsel for Elizabeth then offered both files. The court seems to have assumed that counsel's objection was continuing and, concluding his comment, he said, "Now, under those circumstances, Mr. Edwards [counsel for Raymond], I think your objection is well taken." In his opinion, however, the trial judge seems to suggest that the decree in the 1963 case, dismissing both bill and cross bill, was "of great significance." While we are uncertain as to whether either file is properly in evidence, we shall assume, without actually deciding, that both files were properly admitted. The trial judge seems to have been under the impression that Raymond's 1963 cross bill alleging desertion estops him from maintaining the present suit. We have held otherwise. *Hahn v. Hahn,* 192 Md. 561, 64 A. 2d 739 (1949). In *Matysek* we said:

> "Taking the *Hahn Case* as establishing the doctrine that a prior suit based upon alleged abandonment is not *per se* a bar to a suit by the same party alleging separation by mutual agreement * * *." *Id.* at 49.

There is no mention in the opinion of the trial judge of Elizabeth's charges of infidelity. We shall assume he did not believe them. While we did not see or hear her testify we are

inclined to think believing her would require considerable effort. In any event it did not inhibit the award of the custody of Donald to Raymond. There was testimony that Elizabeth occupies the lower floor of the house, which is a duplex, and that she has rented the second floor apartment. The trial judge was uncertain "whether she is making an honest effort to procure work" but there appears to be no doubt that she is able to work. The report of the Department of Probation filed in the 1963 case suggests that having a job might be good for her.

Besides dismissing Raymond's bill of complaint the trial judge awarded to Raymond the custody of Donald, required Raymond to pay Elizabeth $25.00 per week as permanent alimony, allowed a counsel fee of $150 and made Raymond responsible for the costs in the 1959 and 1963 proceedings as well as the instant case. We shall not disturb his rulings in the matter of custody and court costs but, in view of our decision here, perhaps the amount of the alimony ought to be reconsidered. The withdrawal of trial counsel and the employment of new counsel for this appeal suggests also a reconsideration of the question of counsel fees.

> *Order reversed in part and affirmed in part.*
> *Case remanded for the passage of an order conformable with the views expressed in this opinion.*
> *Costs to be paid by the appellant.*