WILNER *v.* WILNER

[No. 303, September Term, 1967.]

*Decided October 8, 1968.*

14

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Carville M. Downes,* with whom were *Downes & Seiland* on the brief, for appellant.

*Thomas L. Hennessey* for appellee.

SINGLEY, J., delivered the opinion of the Court.

This is an appeal by Alan M. Wilner from a decree of divorce *a mensa et thoro* entered against him by the Circuit Court for Baltimore County in a suit brought by his wife, Brenda K. Wilner.

The parties were married on 20 April 1958, and have two children, now eight and six. The Wilners' marital difficulties apparently commenced in January of 1965, when according to Mr. Wilner's testimony, which was not denied, Mrs. Wilner took a bank book belonging to Mr. Wilner's mother, forged Mr. Wilner's name to a withdrawal order, withdrew the entire balance of $3,000, and spent some $1,900. As a result of the recriminations which followed this incident, Mrs. Wilner consulted a lawyer with a view to arranging a separation, but was persuaded by her counsel to seek psychiatric help. Her psychiatrist recommended intense psychotherapy. Mrs. Wilner discontinued treatment after "a week or two" and in early February 1966, again saw her lawyer with the idea of arranging a voluntary separation.

On 17 February 1966, an altercation developed over Mr. Wilner's race track pass. The parties differ as to what happened. Mrs. Wilner described the incident:

> "I went about my normal household responsibilities, took care of the children, came home, prepared dinner, and he did come home and ate. Then, he went up to his room and read. Then, later on in the evening, I had asked him could I please borrow a racing commission pass that he had had from the racing commission. I thought I'd like to go the following day and take a friend and he said, 'You cannot have it.' I said, 'But you have lent it to me before and it said Mr. and Mrs.

Wilner so it is partially mine,' and as I was going downstairs, he had all of his papers and his wallet on the piano and as I was going down the stairs, he screamed, 'Don't you touch that pass,' and I was walking downstairs toward the piano where I assumed the pass was. He grabbed me, threw me to the floor and I can remember he had his hands over my mouth and nose and I felt like I was suffocating and when I got up, I couldn't see and I felt wet and I ran to the bathroom and saw that I was bleeding and I immediately ran and called the police and he immediately ran and called his mother."

This was Mr. Wilner's version:

"I had a racing pass for Mr. and Mrs. Wilner and one guest, and Brenda said, this is half mine, and I want half, and I am going to take half of it. She went downstairs with the purpose of taking it out of my wallet and tearing it in half. This is what she told me she was going to take half, half that belonged to her. I went down to stop her because I needed the pass and when I got downstairs, she already had my wallet in her hand and when I reached for it, she put her hand behind her back and I went to get it and the area in which we were standing is not carpeted, it's a wood floor and we both [fell] and I removed my wallet by simply taking it away from her. I never hit her, I never kicked her, I never tried to smother her. As soon as I got my wallet, I went back upstairs, and when Brenda got up, the first thing she said is, I'm glad you finally have done that, she ran to the phone, called the police, called the lawyer, called Judge Allen, and then went upstairs into the bathroom. I went upstairs as soon as I heard she called the police, I called my mother, just to have a witness there, if I was going to be carried away to the police station, someone was going to have to stay with the children. The police came, one officer, I believe came. Shortly after that, my mother and my brother came. Brenda was very upset, she was hys-

terical. She wanted to swear out a warrant and Judge Allen, she called Judge Allen, and apparently he persuaded her for some reason. She said, if you leave, I won't swear out the warrant and I was concerned again about the question of, was this a desertion, what was I doing if I left, and she said, no, I just want you out. It isn't desertion, just go, and it was the—understanding was, I was to leave for that night only. I was to come back the next day and that was the only basis on which I left. It was just for the night, to give her a chance to cool off. After she talked to Mr. Myerberg [Mrs. Wilner's counsel], I spoke to Mr. Myerberg that same night and, it was decided that she would not let me back in the house, and I stayed away for a period of about ten days, except for a birthday party and she would not let me come back to live in the house. I came back to get some clothes and I came back for the child's birthday party, and the next time I saw her was, I think, at the birthday party. She had painted herself all up with gentian violet."

Mrs. Cyril M. Wyatt, called as a witness by Mr. Wilner, in response to the question, "Did she [Mrs. Wilner] ever complain to you about being threatened or about being beaten by her husband?" said:

"I did not want to get involved in this and at one time, she told me something about a scuffle over a wallet and I did not remember what the problem was with the wallet, but she did say to me that she had fallen down and that Alan — that he did not really hurt her, but she let him think she [sic] did."

Sometime after the wallet incident, Mrs. Wilner again sought psychiatric assistance. According to Mr. Wilner, during the first joint session with a new psychiatrist, the psychiatrist said, "[I]f this was the case, he could see no future in the marriage and recommended that Brenda [Mrs. Wilner] seek counsel to terminate it." In response to the chancellor's inquiry, "If what was the case?", Wilner continued,

"If she said she was going to continue this kind of spite work, not cooking meals, running up credit, based on that, he said he could see no future in the marriage, and we left and then we made another appointment to come back after Brenda had a chance to talk to a lawyer and we did go back for the second joint visit. Brenda had been to see, I think, Mr. Hennessey [Mrs. Wilner's counsel at that time], and said that we had both agreed to seek a termination of the marriage."

Later, the Wilners visited the psychiatrist a second time, and Mr. Wilner described that interview:

"The recommendation was made in the first joint visit, Your Honor, and then on the second visit, we came back and simply reported that we had followed his recommendation, that she had seen an attorney, and that we were then in the process of attempting to terminate the marriage or at least agreeing on a separation, which would lead to a termination of the marriage. That was the last visit we had jointly with the psychiatrist and I understand she went one or two more times. I didn't know she was going since then."

The record is not clear as to the dates of these interviews, but it would appear from Mrs. Wilner's testimony that the last joint visit was just before mid-August, 1966. According to her testimony, cohabitation had ceased in July.

On 15 August, Wilner left Baltimore to attend a convention in Indiana, and returned on 20 August. On his return, he found a letter dated 17 August from Mrs. Wilner, who had written to him just prior to leaving for New York City:

"Alan,
The girls received your post cards this morning and as I read them I did shed some tears. I don't think for me, (although I feel very sorry for myself) but for them and how terribly they miss you already and how hard it's all going to be.
I truly don't think there can be anything left between us. There are times I have my doubts. Like,

Mon. morning when you left without a good-by. Again, I guess I'm feeling sorry for myself. Probably, even if things were normal you wouldn't have thought of this little nothing which always was so important to me.

Be assured I'll never ever turn the children against you or use them for my personal gain. They need you now and will continue to need you. No matter what you think me capable of doing this I promise.

I left the house as comfortable as possible. Jo Ann will be in Tues. She has the key and has been paid thru Aug.

I'm hoping you'll arrange to come to N. Y. for the childrens sake and to help me with the drive home. This whole business has taken a terrible toll on me physically and mentally as you know and I'm trying my best with the girls and the outside world.

Also, please don't stand on ceremony about contacting Tom Hennessey and getting the ball rolling. The existing situation is truly destructive for the four of us and as soon as some order can be put into our lives again hopefully everyone will benefit. Hoping to hear from you soon.

/s/ Bren"

On 18 August, Mrs. Wilner wrote a letter to her mother-in-law, which read, in part:

"Truthfully, it's been a miserable week for me. I guess I mostly feel very, very sorry for myself besides a great deal more physical & mental work. I truly doubt there is anything left between Alan & myself but the little things still hurt. Like Mon. morning when he left without even saying good-by and this mornings phone call when he didn't even ask to speak to me when the girls had finished. I suppose all these things should make the break easier for me but they aren't.

The children's missing him tear me to pieces but I can't let them see that. No matter what Alan thinks

of me, I'll never, never use them for my own benefit or as a weapon against him. They need him too much. And, he needs them desperately I hope.

Well, enough of this. My only hope at this point is Alan won't stand on ceremony and keep me hanging. He's got to move now that I've got the ball rolling. If you have any influence with him now please help me with getting our lives organized as quickly as possible. The current situation is too false to continue to any ones benefit and I need all my mental & physical facilities to face the job ahead of me."

Sometime after his return from Indiana, Wilner apparently retained an attorney, and counsel for both parties met on 22 September. At this meeting the provisions of a separation agreement were discussed. On 25 September, a new development occurred. According to Mrs. Wilner, there was an altercation over pancakes at the breakfast table, resulting in an atmosphere of tension which persisted throughout the day. As she tells it,

"I prepared dinner. My little daughter was inside the kitchen, and my big daughter was out with him. I said, 'Debbie, it is dinnertime, please come in.' Alison had walked out onto the side porch. He then picked up the big one bodily and walked off and got into his car. I said, 'Where are you going?' The little one became hysterical seeing him carry the big one off, in fact, she was crying too. He wouldn't answer me and drove off. He returned about an hour later. I had called the little one down and given her her dinner. Apparently, he had taken the big one out for dinner. He got home and said, 'I'm leaving,' and I said, 'What do you mean, you're leaving? I thought we were trying to work things out.' He started drawing up this paper and he said, 'But I'm not leaving until you sign this paper so you can't accuse me of desertion,' and he was running up and down.

"He said, 'I'm not going to leave until you sign this paper so you can't accuse me of a desertion.' He was

looking for paper and running up and down the steps. He said, 'Call Mrs. Tannenbaum, our neighbor, to discuss this.' I said, 'I'm not going to call anyone, you call her if you want her.' He did and she came over rather reluctantly, very upset about this and I signed it and at that point I would have signed my name in blood, because I was afraid he was going to beat me up and the children were hysterical and we signed the paper. He packed all his clothes, some of his books, and he left."

Mr. Wilner recounted the events of 25 September:

"I don't recall there was anything very significant during the day. I had not packed any suitcases or any such thing. It was a Sunday, I was probably packing my briefcase for the next morning because I had to teach the next morning. I think it was my first or second class, but I hadn't any suitcases out. I don't recall anything specific during the day. Around dinnertime, Brenda indicated she wasn't going to feed me anymore. She was stopping the cooking again, and I had wanted to take the children out to dinner if I wasn't going to be fed. I felt in a sense a need to be with the children at that time. I couldn't find the younger daughter, Alison, and Brenda was yelling and screaming in the kitchen. The neighbors were all looking around, the doors were open, it was still warm out and I took Debbie, the older one, who was there, and said, let's go out to dinner, to get away for a while. When I came back from dinner, Brenda was furious, and absolutely ordered me out of the house. She wasn't going to do this, she wasn't going to do that, and I told her that under no circumstances was I going to leave the house without the separation agreement, not that one, but the one that the lawyers were then working on, and she indicated she wasn't going to wait that long, if necessary, she was going to call the police again. I said, all right Brenda if you will agree, to a tentative agreement, so I don't come back later

and find myself charged with desertion, I will leave. She said, all right, so I wrote out this thing, which is only intended to be for a week or two, because you [Mr. Wilner's counsel] and Mr. Hennessey had been working on an agreement. I showed it to her, she read it, I never dissuaded her at any time from calling Mr. Hennessey, I never discouraged her from doing it."

The agreement which Mr. Wilner prepared and which he and Mrs. Wilner signed, was as follows:

"This Preliminary Agreement is made this 25th day of September, 1966, by and between Alan M. Wilner (husband) and Brenda K. Wilner (wife), as follows:

1. The parties are now in the process of having a formal separation agreement prepared by their respective counsel. The essential terms have been agreed to in the form of a list prepared by the wife and given to husband.

2. The parties are presently living together, and have been living together. They recognize that their differences are so substantial that they should no longer live together, even pending the formal separation agreement. Accordingly, they agree to separate voluntarily — the husband to move out of the house. The wife agrees that the husband's move is her wish, and that it does not constitute abandonment or desertion.

3. Pending the formal agreement, the husband shall have the right to visit the two children, Deborah and Alison, and to have them with him at reasonable places from 4:40 P.M. on Friday afternoon until 6:00 P.M. on Saturday afternoon each week. The husband will continue to pay the mortgage payment on the home, the utility bills, and $110.00 every other week to the wife for her support and that of the children.

4. The wife agrees that she will not disturb or destroy or sell or in any way injure or dispose of any property belonging to the husband, or which, on the

aforesaid list, is to go to the husband, which may remain in or about the home. The wife further agrees not to pledge the husband's credit for any purpose without his consent.

/s/ Brenda Wilner
/s/ Alan M. Wilner"

The neighbor, Mrs. Mildred Tannenbaum, who came to the house at Mr. Wilner's request to witness the paper, testified that she could not recall whether the Wilners signed in her presence, but she did remember that "[Mrs. Wilner] said she wanted him [Mr. Wilner] out of the house." She thought Mr. Wilner said "[S]omething to [the] effect 'I just want you to witness this paper, that I am not deserting her, that she is making me leave.'"

After the agreement was signed, Mr. Wilner left. Negotiations toward an agreement of separation between the parties continued, however, and on 30 September 1966, Mrs. Wilner sent her husband the following letter:

"9-30-66

Alan,

After talking with Tom Hennessey Fri. I find several things in your agreement which are entirely unsuitable.

First, you may not have the children Christmas, Easter, Summer, Jewish Holidays and Legal Holidays.

Second the total $95 amt. weekly is not what we originally agreed upon.

Third, as long as I am in this rotten house I will not be responsible for any repairs because I do not wish to be here.

I hope you will discuss these with your attorney.

Very truly yours,
/s/ B. Wilner

P.S. I also found out about your election evening affair with Anne. It's all over town."

It would appear that negotiations were prolonged over four months but were never concluded. On 1 February 1967, Mrs.

Wilner filed a bill of complaint for a divorce *a mensa et thoro* on grounds of desertion. The chancellor, in granting the relief prayed, concluded that Wilner had deserted his wife, since he found no evidence that Wilner left with his wife's consent and agreement.

In discussing the agreement of 25 September, the chancellor said:

> "The wife's signature to the preliminary voluntary separation agreement was obtained by the husband by undue influence. Furthermore, it was not witnessed. More importantly, she signed it without benefit of counsel. Her husband knew she had counsel, and his knowledge of this was a fact fully corroborated. In fact, he later arranged for his own counsel to submit to his wife's lawyer a more complete typewritten draft of an agreement at a later date.
>
> "Under the wife's prayer for general relief, the preliminary voluntary separation agreement of September 25, 1966, is declared null and void. Being of no effect, it cannot serve as evidence of the wife's alleged consent and agreement to the husband's leaving. Cf. *Jester vs. Jester*, 246 Md. 162."

With this conclusion we cannot agree. While the judgment of a lower court will not be set aside on the evidence unless clearly erroneous, Maryland Rule 886 a; *Heath v. Heath,* 250 Md. 157, 242 A. 2d 130 (1968); *Moran v. Moran,* 219 Md. 399, 149 A. 2d 399 (1959), what we said in *Blair v. Blair,* 199 Md. 9, 85 A. 2d 442 (1952) is apposite here:

> "We are not unmindful of our long consistent rule that where the chancellor has seen and heard the parties, we will not disturb his findings of fact unless they are clearly erroneous, but in this case, it is not a question of fact but a question of intention to be derived from established facts." 199 Md. at 15.

*See also, Walker v. Walker,* 209 Md. 428, 121 A. 2d 195 (1956).

We do not concur in the chancellor's determination that the agreement of 25 September was a nullity as a matter of law, and that it was not evidential of the wife's consent to the separation. The agreement was, on its face, an interim measure which purported to make no final determination of property rights. The provisions with respect to visitation and support were clearly subject to modification in the definitive agreement which the parties had every reason to believe was being prepared. This is not a case where an agreement waiving all rights to dower, alimony and child custody was misunderstood by an inexperienced 17 year old wife as was the situation in *Jester v. Jester,* 246 Md. 162, 228 A. 2d 829 (1967) cited by the chancellor, nor could the agreement be called "unjust and inequitable" and "palpably unlawful" as it was in *Cronin v. Hebditch,* 195 Md. 607, 74 A. 2d 50 (1950). In such instances, the advice of independent counsel might well be of critical importance. Mrs. Wilner, not lacking in experience in such matters, was represented by counsel, whom she chose not to consult. Under these circumstances, the fact that Mr. Wilner was himself a member of the bar does not alter our view.

While it has long been recognized that a voluntary separation connotes an agreement, *France v. Safe Deposit & Trust Co.,* 176 Md. 306, 326, 4 A. 2d 717 (1939), there is no requirement that there be a formal written agreement. *Hahn v. Hahn,* 192 Md. 561, 568, 64 A. 2d 739 (1949) ; Myerberg, *The Practical Aspects of Divorce Practice* 55-57 (2d ed. 1961). The existence of an agreement may be verified from testimony, the conduct of the parties, *Heath v. Heath,* 250 Md. 157, 242 A. 2d 130 (1968) ; *Fedder v. Fedder,* 248 Md. 162, 235 A. 2d 553 (1967) ; *Matysek v. Matysek,* 212 Md. 44, 47-48, 128 A. 2d 627 (1957), or from other evidence in the case. *Benson v. Benson,* 204 Md. 601, 607, 105 A. 2d 733 (1954).

As Chief Judge Brune, speaking for the Court in *Matysek, supra,* after citing the Maryland cases involving voluntary separation (including *France, Hahn* and *Benson*) said :

"None of the above cases (nor any other which has come to our attention) holds that a voluntary agreement to live separate and apart *must be arrived*

*at either with calmness and courtesy or without anger.*
Courtesy certainly, and calmness probably, were lack-
ing in the instant case, and in all likelihood anger was
present. We think that a mutual agreement may be
reached under such circumstances. The case which
most nearly approaches the present case in the general
tone of language used seems to be *Miller v. Miller,
supra* [178 Md. 12, 11 A. 2d 630 (1940)]. There the
husband had threatened to leave the wife (for a rea-
son which this Court found to be insufficient), and she
replied 'Well if you want to go, go on and go, but you
are going to have to take care of these children.' The
husband claimed that this amounted to a voluntary
agreement to separate. His contention was rejected
because the wife's statement amounted merely to ac-
quiescence in what she could not prevent. *That was not
the situation in the present case. The husband de-
manded that the wife leave. She could have refused.
Instead, she agreed and she did leave."* (Emphasis
supplied.) 212 Md. at 47.

The Wilner agreement was nothing more and nothing less
than Mr. Wilner intended it to be : a temporary stopgap which
provided for alimony, support, custody and visitation pending
the completion of negotiations between the parties' counsel, and
an acknowledgment by both husband and wife that their part-
ing was voluntary. Rather than being extracted by undue in-
fluence practiced by the husband, as the chancellor thought, we
regard it as representing the culmination of an effort commenced
by Mrs. Wilner in January of 1965 when she first consulted
counsel about a separation ; an effort which she resumed in Feb-
ruary of 1966; and resumed again in August of 1966. It was
the final realization of a goal toward which she had been ex-
horting her husband for some six weeks prior to his departure.
It was what she had in mind when she wrote in her letter of
17 August :

"I truly don't think there can be anything left be-
tween us. * * * *Also, please don't stand on ceremony
about contacting Tom Hennessey and getting the ball*

*rolling.* The existing situation is truly destructive for the four of us and as soon as some order can be put into our lives again hopefully everyone will benefit." (Emphasis supplied.)

A day later, in her letter to Mr. Wilner's mother, she sought to achieve the same end:

*"My only hope at this point is Alan won't stand on ceremony and keep me hanging. He's got to move now that I've got the ball rolling. If you have any influence with him now please help me \* \* \*"* (Emphasis supplied.)

In the trial below, Mrs. Wilner laid great stress on her husband's relationship with another woman, but failed to allege or prove any impropriety, unless testimony that they attended the same French class early in 1966 and on 13 September 1966 went together to a motion picture theatre and later that evening attended a political rally could be regarded as improper conduct.

Mrs. Wilner was steadfast in her contention that she signed the agreement because of her fear of her husband. Except for Mrs. Wilner's account of what took place during the scuffle over the race track pass on 17 February which must be read in the context of Mrs. Wyatt's testimony, there was no evidence that Mr. Wilner's conduct was such as would have reasonably justified any real apprehension, much less deprived her of any independence of thought and action, or supported the charge of cruelty contained in her bill of complaint. Mrs. Tannenbaum's presence at the time the agreement was signed and her testimony as to what took place give no support to the contention that Mrs. Wilner's signing was motivated by fear.

We conclude that under these circumstances the entry of a decree of divorce on grounds of desertion was not supported by the facts. The case must, therefore, be remanded so that the decree may be modified and the wife's prayer for a divorce *a mensa et thoro* be denied. At the argument of the case before us, the husband's counsel abandoned the contention that the alimony and a counsel fee awarded below constituted an abuse

of discretion. As a consequence, we shall not disturb the portions of the decree dealing with custody, support, visitation, alimony and counsel fee.

> *Decree reversed in part and affirmed in part; case remanded for modification of decree conformable with this opinion; costs to be paid by appellant.*